880 P.2d 169

Renee M. RICHARDSON and Thaddeus
Richardson, Plaintiffs–Appellants,

v.

SPORT SHINKO (WAIKIKI CORPORA-
TION) d/b/a Queen Kapiolani Hotel;
John Does 1–5; Jane Does 1–5; Doe
Partnerships 1–5; Doe Corporations 1–5;
and Doe Governmental Entities 1–5, De-
fendants–Appellees.

No. 16492.

Supreme Court of Hawai'i.

Aug. 29, 1994.

tel (Sport Shinko) subsequent to a post-arbitration trial *de novo* and from the trial court's order granting sanctions in favor of Sport Shinko. At trial, the Richardsons sought damages for the personal injury sustained by Renee Richardson (Mrs. Richardson) allegedly as a result of Sport Shinko's negligent maintenance of the premises at the Queen Kapiolani Hotel. After the jury rendered its verdict in favor of Sport Shinko, the trial court imposed monetary sanctions against the Richardsons pursuant to Rule 26 of the Hawai'i Arbitration Rules (HAR), which authorizes such sanctions against parties who fail at trial to improve the nonbinding arbitration award they had obtained earlier in the proceedings through the Court–Annexed Arbitration Program (CAAP).

On appeal, the Richardsons claim that the circuit court erred in denying their motions for: (1) a directed verdict on the issue of liability; and (2) a judgment notwithstanding the verdict (JNOV), or in the alternative, for new trial. The Richardsons also maintain that the trial court erred in instructing the jury on the issue of Sport Shinko's duty and in failing to instruct the jury on other matters. We hold that: (1) liability in this case was a question of fact; (2) the circuit court did not abuse its discretion in instructing the jury; and (3) there is substantial evidence to support the jury's verdict. Accordingly, we reject each of the Richardsons' claimed errors and affirm the judgment.

The Richardsons further argue that the award of sanctions must be reversed because the sanctions authorized by HAR 26: (1) may be imposed against a non-prevailing party only when its pursuit of a trial *de novo* is frivolous; (2) may be imposed only as a set-off against a recovery; and (3) violate their constitutional rights to a civil jury trial and equal protection of the laws. Based on the discussion below, we reject each of these arguments and affirm the award of sanctions.

Janice P. Kim and David Allan Feller (Alexander Y.H. Kim, with them, on the brief), Honolulu, for plaintiffs-appellants.

Curtis E. Aldendifer, Honolulu, for defendants-appellees.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Plaintiffs-appellants Renee and Thaddeus Richardson (the Richardsons) appeal from a judgment entered in favor of defendant-appellee Sport Shinko dba Queen Kapiolani Ho-

## I. BACKGROUND

On October 21, 1989, Mrs. Richardson, a self-employed disc jockey, entered the Queen Kapiolani Hotel at mid-day to set up stereo equipment in the hotel's Akala Room prior to

a wedding reception for which she had been hired to provide music. Mrs. Richardson positioned the equipment in the room and ran cords toward an electrical outlet on the wall behind "a plant or something." When she knelt down to plug the cords in, a metal staple, imbedded in the carpet, pierced the inside of her left knee through the cartilage down to the bone.

Mary Louise Guerrero, the hotel's banquet manager and immediate supervisor of the Akala Room, called an ambulance. Paramedics arrived shortly thereafter and removed the staple. Mrs. Richardson's knee was later examined and treated at Kaiser Hospital's emergency room.

As a result of the incident, the Richardsons filed a complaint for general and special damages on August 29, 1990, alleging various theories of negligence against Sport Shinko, the owner and operator of the hotel. In general, the Richardsons complained that they suffered injuries[1] as a result of Mrs. Richardson kneeling on the staple, which injuries were legally caused by Sport Shinko's negligent maintenance of the hotel premises. The case was subsequently assigned to the CAAP.

On June 14, 1991, the arbitrator found Sport Shinko liable and made the following award:

Special Damages:

 Renee Richardson ............. $23,269.33
 Thaddeus Richardson .......... 1,172.47

General Damages:

 Renee Richardson ............. $35,000.00
 Thaddeus Richardson .......... 1,000.00

 TOTAL: $60,441.80

Pursuant to HAR 22, the Richardsons, on July 3, 1991, appealed the award to the cir-

cuit court and requested a trial *de novo*. HAR 22 provides in relevant part:

(A) Within twenty (20) days after the award is served upon the parties, any party may file with the clerk of the court and serve on the other parties and the Arbitration Administrator a written Notice of Appeal and Request for Trial *De Novo* of the action.

(B) After the filing and service of the written Notice of Appeal and Request for Trial *De Novo*, the case shall be set for trial pursuant to applicable court rules.

On July 2, 1992, twelve days before trial, Sport Shinko served an offer of judgment on the Richardsons pursuant to Rule 68 of the Hawai'i Rules of Civil Procedure (HRCP)[2] in the amount of $70,000.00 to Mrs. Richardson and $5,000.00 to Mr. Richardson. The offer was not accepted and expired on its terms on July 12, 1992;[3] trial commenced two days later on July 14, 1992.

The record indicates that, at trial, the Richardsons' primary theory of negligence against Sport Shinko was based on the following contentions: (1) the staples scattered in the Akala Room carpet constituted an unreasonably dangerous condition; (2) Sport Shinko had notice of that condition, yet failed to warn visitors of or remedy it; and (3) the Richardsons were injured as a legal result of Sport Shinko's actions or inactions.

During the trial, Mrs. Richardson testified that after kneeling on the staple in the Akala Room on October 21, 1989 and

while the paramedics were there, one of the guys that was working in the hotel room ... walked over to where the outlet was where he saw me kneeling down. And I saw him kick the carpet or something

1. Thaddeus Richardson (Mr. Richardson) alleged that he missed work, incurred expenses, and suffered loss of consortium as a result of his wife's injuries.

2. HRCP 68 (1990) provides in relevant part:
 At any time more than 10 days before trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against [it] for the money ... specified in [its] offer, with costs then accrued. If within 10 days after service of the offer the adverse party serves written notice

that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs.

3. The Richardsons argued after trial that the offer of judgment was untimely and substantively defective under HRCP 68.

and he came back and he said oh, look, I found another—I found a staple in the carpet.

According to Mrs. Richardson, the employee gave the staple to one of the paramedics, who in turn gave the staple to her. Mrs. Richardson produced a staple at trial which she claimed to have been the same staple recovered by the employee.

Although the origin of the staples was never conclusively determined, the Richardsons elicited testimony from Guerrero and Eugene Virgo, a hotel night janitor, that stray staples could have been left in the room after the recent installation of a new carpet or from construction activities during a "Queen of the Universe" pageant held in the room a week earlier. Virgo testified that he cleans and vacuums the Akala Room during his shift after functions are held in that room. According to Virgo, vacuuming was the best way to detect debris in the carpet because the carpet's pattern made visual inspection difficult. More particularly, Virgo related that he could detect staples while vacuuming because they made a "clinking noise" in the vacuum.

Virgo recalled that, in the week preceding Mrs. Richardson's injury, he had removed and discarded staples found in the Akala Room carpet on three or four occasions while vacuuming. On the night after the pageant, he had found four or five staples; each night thereafter he had picked up fewer and fewer staples until no more could be detected. During this time, Virgo testified, he vacuumed the same areas in the Akala Room twice to make sure that he had removed any foreign particles embedded in the rug. Virgo explained that he was eventually satisfied in his own mind that he had picked up all the staples in the area where Mrs. Richardson was later injured because he no longer heard the clinking noise in the vacuum. Virgo identified the staple removed from Mrs. Richardson's knee as being the same type he had found in the carpet while cleaning.

Guerrero testified that there were no complaints or reports of staples in the Akala Room carpet before Mrs. Richardson was injured and that the room was regularly cleaned and vacuumed during the daytime.

Guerrero further stated that she was in close proximity to Mrs. Richardson when she was injured and had observed the paramedics remove the staple from Mrs. Richardson's knee.

At the close of evidence, the Richardsons moved for a directed verdict on liability, claiming that Sport Shinko was negligent as a matter of law in failing to warn of or remedy the unreasonably dangerous condition (staples in the carpet) in the Akala Room. The trial court denied the motion. On July 20, 1992, the jury returned a special verdict finding that Sport Shinko was not negligent. Judgment was entered accordingly in favor of Sport Shinko on September 22, 1992. On September 29, 1992, the Richardsons filed a motion for a JNOV, or in the alternative, for new trial, which the court denied. Sport Shinko brought its motion for sanctions pursuant to HAR 26, which the court granted in the amount of $5,234.41 on November 25, 1992.

## II. DISCUSSION

### A. Jurisdiction

Initially, we note that the events transpiring after the verdict was rendered in this case present an important jurisdictional issue not addressed by either party. We will consider *sua sponte* whether we have jurisdiction to review the circuit court orders entered after the Richardsons filed their first notice of appeal. *See Kernan v. Tanaka*, 75 Haw. 1, 15, 856 P.2d 1207, 1215 (1993) ("[a]ppellate courts have an obligation to insure they have jurisdiction to hear and determine each case" (citing *State v. Moniz*, 69 Haw. 370, 742 P.2d 373 (1987)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994).

For present purposes, the significant dates and events may be summarized as follows:

07/20/92 Jury returned its verdict in favor of Sport Shinko;

08/04/92 Sport Shinko filed its HAR 26 motion for costs and sanctions as the prevailing party in a trial *de novo* (motion for sanctions);

09/22/92 Written judgment entered;

09/29/92 8:43 a.m.: The Richardsons filed their first notice of appeal;

8:50 a.m.: The Richardsons filed motion for a JNOV or, in the alternative for a new trial (JNOV/new trial motion);

11/02/92 The Richardsons' second notice of appeal filed (presumably prompted by the trial court's oral denial of their JNOV/new trial motion);

11/25/92 Written order filed, granting Sport Shinko's motion for sanctions in the amount of $5,234.41;

12/16/92 Written order filed, denying the Richardsons' JNOV/new trial motion; and

12/30/92 The Richardsons' third notice of appeal filed.

Because "[t]he general rule is that the filing of a notice of appeal divests the trial court of jurisdiction over the appealed case," *Territory v. Damon,* 44 Haw. 557, 561, 356 P.2d 386, 389, *reh'g denied,* 44 Haw. 633, 361 P.2d 63 (1960), *cert. denied,* 368 U.S. 838, 82 S.Ct. 40, 7 L.Ed.2d 38 (1961),[4] we are concerned that the circuit court decided the Richardsons' JNOV/new trial motion and Sport Shinko's motion for sanctions after the first notice of appeal had been filed. If the first notice of appeal remained effective, the circuit court lacked jurisdiction to decide those motions; consequently, we must dismiss the appeal therefrom for lack of appellate jurisdiction. *See D'Elia v. Association of Apartment Owners,* 2 Haw.App. 350, 351, 632 P.2d 298, 299 (1981).

However, the general rule has been tempered by Rule 4(a)(4) of the Hawai'i Rules of Appellate Procedure (HRAP), which provides:

If a timely motion under the [HRCP] or the District Court Rules of Civil Procedure or the Hawaii Family Court Rules is filed in the circuit or district court by any party: (i) for judgment under Rule 50(b), HRCP [motion for a JNOV]; (ii) under Rule 52(b), HRCP and DCRCP, to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59, HRCP and DCRCP, to alter or amend the judgment; or (iv) under Rule 59, HRCP and DCRCP and HFCR, for a new trial; or (v) under Rule 59(g), HFCR, for reconsideration, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect.[5] A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above.[6] No additional fee shall be required for such filing.

The case law in Hawai'i is clear that a notice of appeal has no effect if filed while a timely tolling motion is *pending* in the trial court. *See Island Holidays, Inc. v. Fitzgerald,* 58 Haw. 552, 561, 574 P.2d 884, 890 (1978); *Kamaole Two Hui v. Aziz Enterprises, Inc.,* 9 Haw.App. 566, 571, 854 P.2d 232, 235 (1993). The present case, however, is unique. Although the Richardsons *timely* filed their motion for JNOV/new trial, that tolling motion was "pending" only *after* they had filed (albeit by minutes) their notice of appeal. We have yet to consider the effect of a notice of appeal filed *before* a timely tolling motion. To resolve this issue, we must interpret HRAP 4(a)(4).

The interpretation of a rule promulgated by the courts involves principles of

---

4. More recently, the Intermediate Court of Appeals has applied this rule in dismissing appeals from trial court orders granting motions for attorneys' fees and costs where those orders were entered after a notice of appeal had been filed. *See Azer v. Courthouse Racquetball Corp.,* 9 Haw. App. 530, 532–33 n. 2, 852 P.2d 75, 78 n. 2, *reconsideration denied,* 9 Haw.App. ——, 857 P.2d 600 (1993); *D'Elia v. Association of Apartment Owners,* 2 Haw.App. 350, 351, 632 P.2d 298, 299 (1981).

5. The motions listed in HRAP 4(a)(4) are commonly referred to as "tolling motions."

6. An order is "entered" for purposes of this rule when the court's written order is filed. *Price v. Christman,* 2 Haw.App. 212, 214, 629 P.2d 633, 635 (1981) (citations omitted); *see also Scott v. Liu,* 46 Haw. 221, 227, 377 P.2d 696, 700 (1962); *cf.* HRCP 58 (1990) ("[t]he filing of the judgment in the office of the clerk constitutes the entry of judgment").

statutory construction. *Keaulii v. Simpson*, 74 Haw. 417, 421, 847 P.2d 663, 666, *reconsideration denied*, 74 Haw. 650, 853 P.2d 542, *cert. denied*, — U.S. —, 114 S.Ct. 61, 126 L.Ed.2d 31 (1993).

> The court's foremost obligation in construing a statute is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. Further, statutory language must be read in the context of the entire statute and construed in a manner consistent with its purpose. If the statutory language is ambiguous or doubt exists as to its meaning, [c]ourts may take legislative history into consideration in construing a statute.

*S. Utsunomiya Enters., Inc. v. Moomuku Country Club*, 75 Hawai'i 480, 506–07, 866 P.2d 951, 965, *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994). (internal quotations and citations omitted).

The language of HRAP 4(a)(4) relevant to our present inquiry provides that "[a] notice of appeal filed *before the disposition* of any [tolling motion] shall have no effect." (Emphasis added.) "Disposition" is generally defined as, *inter alia*, "[t]he final settlement of a matter, and with reference to decisions announced by the court, [a] judge's ruling is commonly referred to as disposition[.]" *Black's Law Dictionary* 471 (6th ed. 1990). Rule 4(a)(4) is silent, however, and we believe ambiguous, regarding whether the filing of a tolling motion must *precede* the filing of a notice of appeal in order for the trial court to retain jurisdiction to dispose of the motion. Furthermore, we are aware of no recorded history behind the promulgation of HRAP 4(a)(4). We therefore look to the history of the federal rule after which HRAP 4(a)(4) was modeled—Rule 4(a)(4) of the Federal Rules of Appellate Procedure (FRAP) [7]—for guidance.

The history behind FRAP 4(a)(4) reveals that the rule had specifically been amended to preserve the trial court's jurisdiction to decide timely tolling motions filed *after* a notice of appeal:

> Former Rule 73(a) of the Federal Rules of Civil Procedure provided that, upon the timely filing of [a tolling] motion by any party "[t]he running of the time for filing a notice of appeal is terminated as to all parties" and the full time prescribed by the rule would commence to run, and was to be computed from, the entry of an order disposing of the motion. This provision was carried forward in Rule 4(a) of the [FRAP]. Although the rule covered adequately the situation in which the post trial motion was filed *before* the filing of any notice of appeal, it was not explicit about the situation in which a timely post-trial motion was filed *after* the notice of appeal

> . . . .

> In those rare cases in which a notice of appeal was filed within 10 days following the entry of judgment and *subsequently*, but within the same 10 days, a motion for a new trial was filed, it was held that the jurisdiction of the cause having passed to the court of appeals the district court could not consider the motion unless the court of appeals remanded to permit its consideration.

> In 1979 Rule 4(a) was amended to clarify the procedure. Under Rule 4(a)(4) the timely filing of a motion enumerated in that provision has the effect of nullifying a notice of appeal filed before disposition of the motion. Such a notice of appeal "shall have no effect", and "[a] new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion." Since the notice

---

**7.** FRAP 4(a)(4) (1979) provided:

> If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all

> parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. No additional fees shall be required for such filing.

of appeal has no effect, the district court should dispose of the motion in due course.

9 *Moore's Federal Practice* ¶ 204.12[1] at 4–69–70 (2d ed. 1993) (footnotes omitted) (emphasis added) & ¶ 203.11 at 3–50–51; *accord* Committee Note of 1979 to Amended Subdivision (a).[8]

 We discern no good reason in these circumstances to construe HRAP 4(a)(4) differently from its pre-December 1, 1993 federal counterpart.[9] Therefore, we now hold that the timely filing of a tolling motion, pursuant to HRAP 4(a)(4), renders any notice of appeal filed before it null and void.

Applying HRAP 4(a)(4) to the facts of the case at bar, we hold that the Richardsons' timely JNOV/new trial motion rendered their first notice of appeal null and void. The circuit court therefore retained jurisdiction to decide the merits of that motion. Likewise, the circuit court had jurisdiction to grant Sport Shinko's motion for sanctions because that order was entered before an effective notice of appeal was filed.

Only the Richardsons' third notice of appeal was effective and invoked appellate jurisdiction because it was timely filed *after* the circuit court entered its written order denying their JNOV/new trial motion. Consequently, this court has jurisdiction over all issues raised on appeal in this case.

We now review the merits of the Richardsons' appeal beginning with their claims that the circuit court erroneously denied their directed verdict and JNOV/new trial motions.

### B. *Directed Verdict and JNOV Motions*

The Richardsons first claim that they were entitled to either a directed verdict or a JNOV in their favor because the evidence presented at trial established, as a matter of law, that Sport Shinko was negligent.

 We review denials of directed verdict or JNOV motions *de novo*. *Mehau v. Reed*, 76 Hawai'i 101, 112, 869 P.2d 1320, 1331 (1994) (citation omitted); *see Lussier v. Mau–Van Dev., Inc.*, 4 Haw.App. 359, 372, 667 P.2d 804, 815 (1983). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *See, e.g., In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations omitted) (brackets in original).[10]

 In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the non-moving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment. *Mehau*, 76 Hawai'i at 112, 869 P.2d at 1331 (citing *Guaschino v. Eucalyptus*, 3 Haw.App. 632, 643, 658 P.2d 888, 896 (1983)); *Tsugawa*, 56 Haw. at 71, 527 P.2d at 1282.

---

**8.** HRAP 4(a)(4) was adopted and promulgated in 1984.

**9.** FRAP 4(a)(4) was amended effective on December 1, 1993 to include within its operation, *inter alia*, motions "for attorney's fees under [FRCP] 54 if a district court under [FRCP] 58 extends the time for appeal[.]" FRAP 4(a)(4)(D) (1994). We emphasize that HRAP 4(a)(4) does not include motions for attorneys' fees or costs within its operation; the state trial courts' jurisdiction to entertain and decide such motions, therefore, is still divested the moment a notice of appeal is filed. *See Azer* and *D'Elia, supra* n. 4.

**10.** We note that "substantial evidence" has sometimes been described as "substantial evi-

dence, more than a scintilla." *See, e.g., Kalilikane v. McCravey*, 69 Haw. 145, 152, 737 P.2d 862, 866 (1987). The phrase, however, was strongly criticized in *State v. Kekaualua*, 50 Haw. 130, 134, 433 P.2d 131, 134 (1967) (Levinson, J., concurring), as inherently inconsistent. Moreover, confusion has arisen because "substantial evidence, more than a scintilla" has been used when reviewing motions for new trial. *See, e.g., Kalilikane, supra; Lovell Enters. Inc. v. Campbell–Burns Wood Prods., Inc.*, 3 Haw.App. 531, 541, 654 P.2d 1361, 1368 (1982); and *Lai v. St. Peter*, 10 Haw.App. 298, 869 P.2d 1352, 1363 (1994). Thus, to avoid further confusion, we hereafter disapprove of the phrase "substantial evidence, more than a scintilla" in any context.

Although the Richardsons cite negligence cases from other jurisdictions, the controlling law in this jurisdiction is well-settled. Hawai'i no longer follows the common law scheme that categorized a premises owner's duty to those coming onto his or her land based on the status of the visitor (*e.g.*, trespasser, licensee, invitee). *Corbett v. Association of Apartment Owners of Wailua Bayview Apartments*, 70 Haw. 415, 416, 772 P.2d 693, *reconsideration denied*, 70 Haw. 661, 796 P.2d 1004 (1989) (citations omitted). Instead, the general rule with respect to all landowners is that "[a] possessor of land, who knows or should have known of an unreasonable risk of harm posed to persons using the land, by a condition on the land, owes a duty to persons using the land to *take reasonable steps to eliminate the unreasonable risk*, or warn the users against it." *Corbett*, 70 Haw. at 415, 772 P.2d at 693 (emphasis added); *see also Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 386, 742 P.2d 377, 384 (1987). Thus, when reasonable steps are taken to eliminate the unreasonable risk of harm, no duty to warn remains.

In this case, Sport Shinko acknowledges that it was duty-bound to Mrs. Richardson as set forth in *Corbett*. The Richardsons claim that the steps taken to remove the staples from the carpet were wholly inadequate and, therefore, Sport Shinko was required to warn Mrs. Richardson of the unreasonably dangerous condition on the premises. By failing to do so, the Richardsons allege that Sport Shinko acted negligently as a matter of law. As a general principle, however, the question whether one has acted reasonably under the circumstances is for the trier of fact to determine. *Knodle*, 69 Haw. at 387, 742 P.2d at 384; *Bidar v. AMFAC, Inc.*, 66 Haw. 547, 552–53, 669 P.2d 154, 159 (1983). This case presents no exception. *Cf. Tsugawa v. Reinartz*, 56 Haw. 67, 527 P.2d 1278 (1974) (negligence determined as a matter of law).

Based on a thorough review of the record and viewing the evidence presented in the light most favorable to Sport Shinko, we cannot say as a matter of law that Sport Shinko failed to take reasonable steps to eliminate the risk posed by the staples in the carpet. Evidence was presented that: (1) vacuuming was the best way to detect debris in the carpet because the carpet's pattern made visual inspection difficult; (2) the carpet in the Akala Room was regularly cleaned and vacuumed during the day and night prior to the accident; (3) Virgo, the night janitor, vacuumed the carpet thoroughly each night, picking up fewer and fewer staples until he could detect no more staples; (4) Virgo was satisfied that no staples were left in the carpet prior to the accident; and (5) there were no complaints or reports of staples in the Akala Room prior to the time of Mrs. Richardson's injury.

Based on that evidence and the inferences which may reasonably be drawn therefrom, jurors could have found that, by the time Mrs. Richardson was injured, Sport Shinko had taken adequate measures to discover and dispose of any staples remaining in the carpet and that Sport Shinko reasonably believed no undue risk of harm was posed to visitors entering the hotel premises. Consequently, the jurors could have concluded that the circumstances triggering Sport Shinko's duty to warn had ceased to exist. We therefore hold that the motions for directed verdict and JNOV were correctly denied.

### C. *Motion for New Trial*

The Richardsons also argue that the circuit court abused its discretion in denying their alternative motion for new trial because the jury's verdict was clearly against the weight of the evidence.

Unlike a directed verdict or JNOV motion, on a new trial motion, "[the] movant need not convince the court to rule that no substantial evidence supports [its] opponent's case, but only that the verdict rendered for [its] opponent is against the manifest weight of the evidence." *Petersen v. City and County of Honolulu*, 53 Haw. 440, 441, 496 P.2d 4, 6 (1972).[11] Both the grant and denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discre-

11. *See supra* note 10.

tion. *Harkins v. Ikeda*, 57 Haw. 378, 380, 557 P.2d 788, 790 (1976). An abuse of discretion occurs where the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26 (citation omitted), *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992).

Based on the evidence previously noted, we cannot say that the jury's verdict against the Richardsons was against the manifest weight of the evidence. Therefore, we hold that the circuit court acted well within its discretion in denying the Richardsons' alternative motion for a new trial.

### D. *Jury Instructions*

The Richardsons allege that the trial court erred in failing to instruct the jury on certain matters. On appeal, the trial court's refusal to give a requested jury instruction is reviewed for abuse of discretion. *City & County of Honolulu v. International Air Serv. Co., Ltd.*, 63 Haw. 322, 339, 628 P.2d 192, 199 (1981); *Tittle v. Hurlbutt*, 53 Haw. 526, 530, 497 P.2d 1354, 1357 (1972). The trial court does not abuse its discretion by refusing a requested instruction that is substantially covered by other instructions, even when the refused instruction is a correct statement of the law. *State v. Pioneer Mill Co.*, 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981); *see also State v. Pinero*, 75 Haw. 282, 290–92, 859 P.2d 1369, 1374 (1993). Whether a jury instruction properly states the law is a question that this court will review *de novo*. *See S. Utsunomiya*, 75 Haw. at 506, 866 P.2d at 965 (questions of law are reviewed under the right/wrong standard of review).

#### 1. **Richardsons' Proposed Instruction No. 5**

The Richardsons allege that the trial court erred in denying their proposed instruction No. 5 regarding premises liability. The proposed instruction provided as follows:

As a guest of Sport Shinko at the Queen Kapiolani Hotel, Renee Richardson was not under a duty to arm herself against the negligence of Sport Shinko. A plaintiff is required only to exercise the same ordinary care as a reasonable person might under similar circumstances, and Mrs. Richardson was not required to look for or observe hidden or unexpected hazards at the hotel. Ordinary care required only that she observe obvious and plainly visible hazards to her safety.

The Richardsons argue that "[b]y failing to instruct the jury as to the parties' relative and unequal responsibilities for latent hazards, the court misled the jury by inferring that [Sport Shinko's] duty to inspect and to warn was less than the law requires." At trial, the Richardsons complained:

[A] hotel is required to take care of hidden unreasonable risks of harm and people who are on the premises are not required to arm themselves against hidden hazards ... Mrs. Richardson was not under an equal burden with the hotel to identify hidden risks, in which case if you don't give the instruction, the absence of a visual hazard to Mrs. Richardson makes it look like it was nobody's fault, it was hidden.

The trial court instructed the jury on Sport Shinko's duty as follows:

If a condition exists upon one's property which poses an unreasonable risk of harm to persons coming upon said property, then the possessor of the property, if the possessor knows or should have known of the unreasonable risk, owes a duty to the persons to take reasonable steps to eliminate the unreasonable risk or adequately warn the users against such risk.

Sport Shinko's Requested Instruction No. 14. This is a correct statement of the law in Hawai'i. *See Corbett*, 70 Haw. at 417, 772 P.2d at 695. Moreover, we note that during the settling of instructions, the court initially indicated its inclination to refuse the Richardsons' proposed instruction No. 5; however, the court suggested modifying the instruction to read solely that "[a] plaintiff is required only to exercise the same ordinary care as a reasonable person might under similar circumstances." This, too, was a correct statement of the law regarding the obligations imposed upon Mrs. Richardson. *See*

*Young v. Price,* 47 Haw. 309, 316, 388 P.2d 203, 208 (1963). However, after further discussion, Richardsons' counsel apparently rejected the court's suggested modification and withdrew instruction No. 5, "with the reservation of my original objection to the [court's] rejection of the original instruction as presented."

▆ Additionally, the Richardsons argue that instruction No. 14 regarding premises liability was "improper because it failed to inform the jury of [Sport Shinko's] obligation to remedy and/or warn of hidden or latent hazards on the hotel premises[;]" however, we note that instruction No. 14 was "given as modified *by agreement.*" Having accepted the instruction, as modified, the Richardsons waived any objection to it. *See Stratis v. Pacific Insurance Co., Ltd.,* 7 Haw.App. 1, 10, 739 P.2d 251, 257 (1987).

We hold that the trial court correctly instructed the jury on Sport Shinko's duty by giving instruction No. 14 and correctly refused the Richardsons' proposed instruction No. 5 as originally presented.

### 2. The Richardsons' Proposed Instruction No. 6

The Richardsons also claim that the trial court erred in refusing to instruct the jury on "the impact of [Sport Shinko's] failure to produce critical evidence in discovery and at trial." In particular, the Richardsons argue that they were entitled to a remedial instruction based on Sport Shinko's failure to produce the original, as opposed to a photocopy, of the incident report prepared by Guerrero on October 21, 1989.

As previously noted, Guerrero testified that she observed the paramedics remove a staple from Mrs. Richardson's knee. She further testified that she retrieved the removed-staple, taped it to the original incident report that she prepared, and placed the incident report in the hotel general manager's mailbox. Although the record is unclear, Sport Shinko apparently provided the Richardsons with a photocopy of the incident report at some point earlier in the litigation.

Subsequently, either at or shortly before trial, the Richardsons requested that the

original report be produced because they believed that marks on the photocopy at the bottom center and top left-hand corner of the report represented images of the actual staples taped to the original. Evidently, after an unsuccessful search, counsel for Sport Shinko represented that he could not locate the original report. Although his explanation is unclear, Sport Shinko's counsel informed the court that

[t]he confusion is that Mrs. Guerrero testified at deposition and here today that she taped a staple to the bottom of the report.

This is what I believed when I first picked up the file was the original report, it has the actual staple taped to the bottom but it is a photocopy. I have—I had presumed that this was the original until [opposing] counsel pointed out to the contrary mainly because it had the staple taped to it.

The Richardsons moved for a directed verdict based on Sport Shinko's failure to produce the original incident report, arguing:

Early on in the case a copy of the incident report was provided to our office. We did not see the original document. If you look at a copy of the document that was produced to us, there are two staples attached to that form. There's an entire whole staple at the bottom of the page. The testimony of Renee Richardson at the accident was that employees of the hotel picked up whole staple [sic] or whole staples from the carpet around where she was injured by the single straightened staple that went into her knee. That document with the staples attached to it indicates that that's true. Apparently the original has been destroyed or lost somehow, the broken staple moved to a copy of the document, and the author of the document, Miss Guerrero sitting here today with us today, now claims that the [mark] ... at the top of the copy ... isn't a staple at all; it's actually a xeroxing defect. Without the original document we don't have any proof ... that there were multiple staples or at least no corroborating proof of Miss Guerrero's statement in her incident report where she said that loose staples were

picked up from the carpet at the time of the accident.

The circuit court denied the motion.

Thereafter, the photocopy of the report was offered by the Richardsons and admitted into evidence at trial by stipulation of the parties.[12] On direct examination by the Richardsons, Guerrero verified the report and suggested that the mark at the bottom of the photocopy was an image of the staple that was removed from Mrs. Richardson's knee. The Richardsons were unsuccessful, however, in attempting to establish through Guerrero that the mark at the top of the photocopy was an image of a second staple recovered by Guerrero in investigating the incident.

At the close of Guerrero's examination, the Richardsons requested that the court invoke its inherent power under *Wong v. City & County of Honolulu,* 66 Haw. 389, 665 P.2d 157 (1983),[13] and enter judgment on liability in their favor based on the absence of the original incident report. The Richardsons renewed the arguments they had raised earlier and also complained that they could not be sure "if there was more writing in the original [report] than contained in the xerox copy." Upon query by the court regarding the applicability of *Wong,* counsel for the Richardsons admitted that he had no specific evidence that the original report was destroyed. The court ultimately denied the motion based on the lack of evidence that the original report had been tampered with or destroyed, but reserved ruling on whether the Richardsons would be entitled to a remedial instruction.

After the close of trial, the Richardsons proposed the following instruction:

During the testimony of Sport Shinko's employee Mary Guerrero, a copy of an Incident Report which Mary Guerrero testified she wrote was marked as Plaintiff's Exhibit "[25]". The original Incident Report written by Mary Guerrero was and still may be in the custody and control of Sport Shinko, but the original document was never produced by Sport Shinko. The original document may have contained information different from the information in Exhibit "[25]." The jury may consider the absence of the original Incident Report and Sport Shinko's failure to produce the original report in its deliberations, and may infer from the absence of the original report that it contained information favorable to the Plaintiffs in this case.

Richardsons' Proposed Instruction No. 6. The court refused to give the instruction, reasoning that it was "an unfair and prejudicial commentary upon the evidence[.]" *See* Hawai'i Rules of Evidence (HRE) 1102.[14]

Relying on *Wong,* the Richardsons challenge on appeal the court's rejection of their proposed instruction No. 6, contending that the trial court had the inherent power to give their instruction. In failing to do so, the Richardsons contend that the trial court abused its discretion because

[t]he prejudice resulting ... from the absence of the original report was manifest. First, the Richardsons were unable to clearly establish that multiple staples were found in the carpet at the scene of Mrs.

---

**12.** Although Sport Shinko's counsel's explanation to the court seems to indicate that the photocopy of the report in his file had the actual staple taped to the bottom of it, there is no explanation in the record as to why that copy was not produced. The document that was marked as "Plaintiff's Exhibit 25" and admitted into evidence was a photocopy of the report allegedly reflecting what appeared to be a staple image as opposed to the actual staple itself taped to the bottom.

**13.** Briefly, in *Wong,* a pedestrian was struck by an automobile while attempting to cross an intersection controlled by malfunctioning traffic lights. The pedestrian and her parents brought suit against the City, among others, alleging that

the City's negligent failure to properly maintain the traffic signal control box was the legal cause of the accident. Despite informal and formal requests for production of the control box, a private contractor, under the supervision of City employees, subsequently removed and destroyed the traffic signal control box. Consequently, the trial court imposed a preclusion sanction whereby the City was estopped from claiming that the malfunctioning traffic lights were caused by anything other than its own negligence, which sanction was upheld on appeal.

**14.** HRE 1102 provides in relevant part that "[t]he court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence."

Richardson's injury. The photocopy report produced clearly shows not only the injuring staple, but another staple at the top of the page. Bolstered by the absence of the original document to confirm the discovery of the second staple in the Hotel's possession at the time of the incident, [Sport Shinko] sought to undermine Mrs. Richardson's testimony that additional staples had been found at the scene. Second, the Richardsons were unable to establish the full contents of the Incident Report itself. . . . It could not be determined from the report what information, if any, may have been removed from the report prior to being copied.

In upholding the sanction imposed by the circuit court in *Wong* as a proper exercise of the trial court's broad discretion to issue discovery sanctions under HRCP 37 (Failure to Make Discovery: Sanctions), we stated:

The sanction imposed by [the trial court] is commensurate with the prejudice suffered by the plaintiffs as a result of the City's destruction of the traffic signal box. If the control box had been produced, plaintiffs would have had the opportunity to prove through their experts that the traffic light malfunction was caused by the City's improper maintenance of the control box. Since the box and its contents were destroyed due to the fault of the City, it is only fair that the sanctions be imposed so that the City does not benefit from its destruction of potentially significant evidence.

*Wong,* 66 Haw. at 394, 665 P.2d at 161. Thus, key to our holding in *Wong* was: (1) the City's culpability in destroying a piece of potentially critical evidence formally requested in discovery; (2) the resulting prejudice to the plaintiffs' case; and (3) the inequity that would occur in allowing the City to accrue a benefit from its conduct.

■ In this case, the Richardsons have failed to establish, or even allege, that they propounded a formal written discovery request for the production of the original incident report. However, even if they had made such a request, there is no evidence in the record that they moved to compel compliance with that request, or that such a motion would have been futile. Without some evidence that Sport Shinko wrongfully failed to provide discovery, the trial court's powers under HRCP 37(d) (Failure of Party to . . . Respond to Request for Inspection) were not implicated.

■ Nonetheless, courts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute. *Cottle v. Superior Court,* 3 Cal.App.4th 1367, 1377, 5 Cal. Rptr.2d 882, 887 (1992); *accord State v. Moriwake,* 65 Haw. 47, 55, 647 P.2d 705, 711–12 (1982).[15] Among courts' inherent powers are the powers "to create a remedy for a wrong even in the absence of specific statutory remedies[,]" *Peat, Marwick, Mitchell v. Superior Court,* 200 Cal.App.3d 272, 288, 245 Cal.Rptr. 873, 883 (1988) (citation omitted) (emphasis omitted), and "to prevent unfair results." *Id.* at 288, 245 Cal.Rptr. at 884 (citation omitted). The courts also have inherent power to curb abuses and promote a fair process which extends to the preclusion of evidence and may include dismissal in severe circumstances. *Id.; Moriwake,* 65 Haw. at 55, 647 P.2d at 712 (inherent power to "administer justice" includes power to *sua sponte* dismiss a criminal indictment with prejudice under appropriate circumstances). It follows that if the trial court has the inherent power to level the "ultimate sanction" of dismissal, it necessarily has the power to take all reasonable steps short of dismissal, depending on the equities of the case. In particular, the trial court has the inherent power, as the Richard-

15. HRS § 603–21.9(6) (1985) provides that the circuit court shall have the power:

To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

Section 603–21.9(6) "is merely a legislative restatement of the inherent powers doctrine[.]" *Kukui Nuts of Hawai'i, Inc. v. R. Baird & Co.,* 6 Haw.App. 431, 438, 726 P.2d 268, 272 (1986).

sons suggest, to fashion a remedy to cure prejudice suffered by one party as a result of another party's loss or destruction of critical evidence.

■■■■ Thus, in the case before us, the trial court had the inherent power to provide a remedial jury instruction addressing the loss of the original incident report if it deemed such a measure appropriate. Had it exercised its inherent power, we would review its ruling for abuse of discretion. *Kukui Nuts*, 6 Haw.App. at 438, 726 P.2d at 272 (trial court's exercise of its inherent powers is subject to review for abuse of discretion). By the same token, we will review its refusal to exercise an inherent power under the same abuse of discretion standard. In this instance, we conclude that the court did not abuse its discretion.

First, there is no evidence to establish that Sport Shinko's failure to produce the original report at trial was intentional. Indeed, based on the record before us, it is difficult even to conclude that Sport Shinko's failure to produce the original report was negligent. The Richardsons merely allege that

[c]ulpability for the loss of that critical evidence clearly lies with the Hotel. [Sport Shinko] had that evidence within its custody and control since the time of Mrs. Richardson's injury, and certainly knew that the document would be key evidence in the case. Despite that knowledge, the Hotel failed to preserve and produce that evidence.

It appears, however, that the Richardsons waited until—or at least very shortly before—the commencement of trial to demand the original report. Based on the record, we are left to speculate whether Sport Shinko had reasonable time to thoroughly search and locate the original incident report after the Richardsons made their request. Further, there is no evidence in the record that the original report was constantly within Sport Shinko's custody and control since the time of Mrs. Richardson's injury. Likewise, there is no evidence in the record that the original incident report was altered or destroyed.

In any event, we reject the Richardsons' allegation that they were severely prejudiced by the absence of the original incident report at trial. The Richardsons were not prevented from adducing evidence to establish that more than one staple was recovered from the carpet on the date of the incident. Indeed, Mrs. Richardson testified that a hotel employee found a second staple in the carpet.

Further, the Richardsons had a full opportunity to examine Guerrero concerning the accuracy and completeness of the report in deposition and at trial. Thus, unlike in *Wong*, where the physical characteristics of the traffic signal control box itself were of pivotal importance, the incident report in this case was merely a memorialization of Guerrero's perception of the events that transpired on the day of the incident. There is no allegation in this case that Guerrero's memory was impaired at trial.

Furthermore, having stipulated the photocopy of the original incident report into evidence, the issue whether the photocopy correctly and completely reflected the contents of the original was for the trier of fact to determine. HRE 1008(3);[16] *accord E.W. French & Sons, Inc. v. General Portland, Inc.*, 885 F.2d 1392, 1398 (9th Cir.1989) (once admitted, the trier of fact determines the authenticity of evidence and its probative force). We believe arguments on that issue are more appropriately raised by counsel rather than the court. *See* HRE 1102.[17]

16. HRE 1008(3) (1985) provides in relevant part that, when an issue is raised "whether other evidence of contents correctly reflects the contents [of a writing], the issue is for the trier of fact to determine as in the case of other issues of fact."

17. HRE 1102 (1985) provides:
**Jury instructions; comment on evidence prohibited.** The court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evi-

dence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses.
HRE 1102 is not completely dispositive of the present issue because it does not supersede the circuit court's inherent powers. *See Cottle*, 3 Cal.App.4th at 1377, 5 Cal.Rptr.2d at 887 ("[i]nherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute"); *see also* HRE 102 (1985) (HRE "shall be construed to secure fairness in

Accordingly, we hold that the circuit court did not abuse its discretion in refusing the Richardsons' proposed instruction No. 6.

### E. *HAR 26 Sanctions*

The Richardsons allege various errors with regard to the circuit court's award of sanctions against them in the amount of $5,000.00 in attorneys' fees and $234.41 in costs pursuant to HAR 26, which provides:

> **SANCTIONS FOR FAILING TO PREVAIL IN THE TRIAL *DE NOVO*; COSTS.**
>
> (A) After the verdict is received and filed, or the court's decision rendered in a trial *de novo,* the trial court may, in its discretion, impose sanctions, as set forth below, against the non-prevailing party [18] whose appeal resulted in the trial *de novo.*
>
> (B) The sanctions available to the court are as follows:
>
> (1) Reasonable costs and fees (other than attorneys' fees) actually incurred by the party but not otherwise taxable under the law;
>
> (2) Costs of jurors;
>
> (3) Attorneys' fees not to exceed $5,000;
>
> (C) Sanctions imposed against a plaintiff will be deducted from any award rendered. Sanctions imposed against a defendant will be added to any award rendered.
>
> (D) In determining sanctions, if any, the court shall consider all the facts and circumstances of the case and the intent and purpose of the [Court Annexed Arbitration] Program in the State of Hawaii.

The Richardsons argue that the award of sanctions must be reversed because sanctions under HAR 26: (1) may only be imposed for the frivolous or bad faith pursuit of a trial *de novo;* and (2) may be granted only to offset an affirmative recovery by the sanctioned party.

### 1. Frivolous or Bad Faith Pursuit of Trial *De Novo*

The Richardsons contend that their appeal from the arbitration award was not frivolous; therefore, sanctions should not have been awarded. The Richardsons also contend that the circuit court improperly considered Sport Shinko's HRCP 68 offer of judgment (settlement offer) in deciding whether to impose the sanctions.

We need not address whether the Richardsons' appeal from the arbitration award was frivolous because the circuit court clearly did not draw that conclusion in deciding to impose sanctions against them. Instead, the record reveals that the circuit court sanctioned the Richardsons because it had concluded that the Richardsons' decision to continue litigating this matter post-arbitration was *unreasonable* under the circumstances.

■ In granting Sport Shinko's motion for HAR 26 sanctions, the circuit court explained:

> The jury found the absence of negligence and I have to agree with the jury. The arbitration officer, I thought, was extremely generous in [her] offer [sic], which plaintiff rejected, and plaintiff had the right to reject it but at the time of the trial, the defendant made an offer of judgment, which even exceeded the award handed down by the mediator and the plaintiffs refused it. *It's not a question of bringing a frivolous lawsuit.* The sanctions that I impose is [sic] not because plaintiffs appealed the findings of the arbitrator. *I*

---

administration ... of the law of evidence"). We emphasize that the trial courts have no authority to act contrary to HRE 1102 except in rare circumstances when the equities of a case justify the court's inherent power to do so.

**18.** Under HAR 25, the "prevailing party" in a trial *de novo* is

the party who has (1) appealed and improved upon the arbitration award by 15% or more, or (2) has not appealed and the opposing party has appealed and failed to improve upon the arbitration award by 15% or more. For the

purpose of this rule, "improve," or "improved" means to increase that award for a plaintiff or to decrease the award for a defendant. (B) The "Prevailing Party" under these rules, as defined above, is deemed the prevailing party under any statute or rule of court, and as such is entitled to costs of trial and all other remedies provided by law.

In the instant case, the Richardsons, having appealed the arbitration award and having failed to improve upon the award by 15% or more, are deemed to be the "non-prevailing part[ies]."

*feel that plaintiffs overreached the award by the arbitrator and the offer of judgment by the defendant I found to be extremely reasonable and I find that the plaintiffs took a chance and they lost, because the liability was highly questionable from the start and 12 people couldn't fault the defendants.*

(Emphasis added.)

We must initially determine whether the circuit court correctly interpreted HAR 26 as authorizing sanctions for the "unreasonable" pursuit of a trial *de novo.* The circuit court's interpretation of HAR 26 constituted a conclusion of law which this court reviews under the right/wrong standard. *Keaulii,* 74 Haw. at 421, 847 P.2d at 666 (circuit court correctly concluded that grant of a pretrial motion to dismiss with prejudice was "decision rendered in trial *de novo* " within meaning of HAR 26); *Kealoha v. County of Hawai'i,* 74 Haw. 308, 324, 844 P.2d 670, 678 (circuit court erroneously construed HAR 26 to allow sanctions against non-appealing party), *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993).

We note that *Kealoha* supports the Richardsons' argument that HAR 26 was intended to discourage the "frivolous" pursuit of a trial *de novo.* In *Kealoha,* we stated:

> The HAR provide for sanctions against an appealing party, that is, the party dissatisfied with an arbitration award, who insists on pursuing a trial *de novo* but fails to improve the award. The purpose of the potential sanctions is to discourage *baseless appeals* from arbitration awards, and thus to discourage incurring further costs and expenses of trial.

*Kealoha,* 74 Haw. at 326, 844 P.2d at 678–79 (emphasis added). However, although we recognized that the purpose of HAR 26 is to discourage "baseless" appeals, we were not called upon in *Kealoha* to determine whether that purpose is exclusive of all others. We now hold that, based on the plain language and purpose of HAR 26, limiting the application of the rule to frivolous or baseless appeals from the arbitration award would be unduly restrictive.

First, we find no support in the language of HAR 26 for the Richardsons' contention

that sanctions may be imposed *only* for the frivolous pursuit of a trial *de novo.* HAR 26 does not place any express restrictions on the court's discretion to impose sanctions against the "non-prevailing" party. In other words, the only explicit limit on the circuit court's discretion to impose HAR 26 sanctions is that the party who has appealed the arbitration award must have failed to "improve" upon the award by 15% or more. *See* HAR 25(A).

Second, the Richardsons' interpretation of HAR 26 is not consistent with the purpose of the rule, which becomes clear when considered in the proper context.

In recent years, with the increase of civil litigation, escalating costs to the parties, and the strain on already scarce judicial resources, there is a dire need for prompt, equitable, and cost-efficient resolution of civil disputes before trial. A recent study entitled "Assessment of Civil Legal Needs of Low- and Moderate–Income People in Hawaii," prepared for the Hawai'i Commission on Access to Justice by The Spangenberg Group of West Newton, Massachusetts, has determined that there has been and is a serious level of unmet legal needs among such families in Hawai'i because they simply cannot afford market-rate legal services. It is well-established that, in most instances, the longer a case is in litigation, the more expensive it is for the parties. Thus, we have recognized time and again that the "proclaimed public policy of our legislature is to encourage arbitration as a means of settling differences and thereby avoid litigation." *Leeward Bus Co. v. City & County of Honolulu,* 58 Haw. 64, 71, 564 P.2d 445, 449 (1977) (citation omitted). Further, courts have realized that, "[b]y expediting the adversary process, arbitration promotes quicker settlement of cases thereby speeding up access to the courts[.]" *Firelock Incorporated v. The District Court In and For the 20th Judicial District,* 776 P.2d 1090, 1099 (Colo.1989) (citations omitted).

Accordingly, the legislature statutorily codified the CAAP as a means to reduce the delay and costs involved in protracted litigation by "provid[ing] for a procedure to obtain

prompt and equitable resolution of certain civil actions in tort through arbitration." HRS § 601–20(a) (Supp.1992); HAR 2(A); Spec.Comm.Rep. No. S5–86, in 1986 Senate Journal Special Session, at 29. At the same time, the supreme court was delegated the authority to adopt rules to implement the CAAP. HRS § 601–20(a). In doing so, this court promulgated HAR 26 to enforce the objectives of the CAAP.

Indisputably, baseless or frivolous appeals from an arbitration decision subvert the purposes of the CAAP because they prevent prompt and equitable resolutions of actions and, as such, must be discouraged. The goals of the CAAP would be jeopardized without a mechanism to ensure meaningful participation in the program and to encourage participants to seriously evaluate the merits of their case following the arbitration before expending the additional time and expense of a trial *de novo*. In other words, the vital objectives of the CAAP cannot be met if participants invariably treat arbitration as a routine or *pro forma* step along the path to trial *de novo* by rejecting reasonable arbitration decisions or reasonable post-arbitration settlement offers, even though the decision to appeal is not technically "frivolous."

 Thus, HAR 26 sanctions may be imposed to penalize a non-prevailing party whose decision to appeal the arbitration award and pursue a trial *de novo* was unreasonable under the circumstances of the particular case, albeit grounded to some degree in law or fact.[19]

 Accordingly, based on the plain language of the rule, we hold that, when the circuit court's decision to impose HAR 26 sanctions is challenged on appeal, the only relevant inquiries are: (1) whether the party against whom the sanctions were imposed is a "non-prevailing party" in the trial *de novo;* and (2) whether the decision to impose sanctions constituted an abuse of discretion. Because there is no dispute that the Richardsons were the non-prevailing parties in the trial *de novo*, we examine whether the circuit court's decision to impose sanctions in this particular case constituted an abuse of discretion.

 At the outset, we reject the Richardsons' argument that the circuit court improperly considered Sport Shinko's settlement offer made on the eve of trial in deciding whether to impose HAR 26 sanctions in this case. The record confirms that the circuit court imposed sanctions because, in its view: (1) Sport Shinko's liability for Mrs. Richardson's injuries was "highly questionable from the start;" and (2) the Richardsons "overreached the award by the arbitrator ... took a chance and they lost." Nevertheless, we believe the circuit court properly considered Sport Shinko's settlement offer as one of "the facts and circumstances of the case" that it "shall consider" in determining the *amount* of sanctions to be imposed. HAR 26(D).

 The Richardsons claim that sanctions were not warranted in this case; they argue that their appeal was reasonable considering that:

(1) the [Richardsons] had special damages of at least $30,000; (2) the injury sustained by Mrs. Richardson was crippling, permanent and inoperable; (3) the issues and evidence on special damages were undisputed by [Sport Shinko] who presented no evidence on the issues at trial; (4) [Sport Shinko] tacitly admitted that the arbitrator's award was insufficient, eventually offering the [Richardsons] a total of $75,000 in general damages only to settle the case, more than double the general damages offered by the arbitrator.

However, as we have previously noted, liability in this case was a question of fact, and its resolution was by no means certain. The jury's verdict, which we have upheld, certainly lends credence to the circuit court's observation that "this [was] not a case of very obvious or patent defect on the defendant's premises[.]" Moreover, even assuming that Sport Shinko was negligent, we cannot say that the circuit court's implicit evaluation

---

**19.** We intimate no view as to what other types of conduct may justly provoke sanctions under HAR 26.

that the arbitration award of $60,441.80 was equitable "exceeded the bounds of reason."

The Richardsons have not specifically cited the record to verify the claim that their special damages were at least $30,000.00. *See Traders Travel Int'l, Inc. v. Howser,* 69 Haw. 609, 616, 753 P.2d 244, 248 (1988) (supreme court is not obligated to review entire record to verify appellant's undocumented contentions). In any event, we note that Sport Shinko presented evidence at trial challenging Mrs. Richardson's total claim for lost wages by over $7,000.00 and that the arbitrator awarded her $23,269.33 for special damages.

Finally, we note merely that reasonable minds could differ over Sport Shinko's motive for making a settlement offer in excess of the arbitration award, such as to terminate its anticipated attorney's fees and costs of the trial as well as an appeal and perhaps a remand for retrial.

Based on the record, we cannot say that the arbitrator's award was manifestly unjust. Accordingly, we hold that the circuit court did not abuse its discretion in determining that the Richardsons' appeal from the arbitration award was unreasonable.[20]

### 2. Offsetting An Affirmative Verdict

■ Relying on the language of HAR 26(C), the Richardsons argue that

[e]ven if there were a factual basis for this court's award of sanctions under Arbitration Rule 26, the rule does not allow such an award to be paid by a party out of pocket. The clear language of the rule indicates that sanctions may be used to offset an affirmative verdict to a plaintiff.

We need not venture beyond the words of the rule to reject this argument. *See AIG Hawai'i Ins. Co. v. Estate of Caraang,* 74 Haw. 620, 633–34, 851 P.2d 321, 328 (1993) (" 'where the statutory language is plain and

unambiguous, our sole duty is to give effect to its plain and obvious meaning' ") (citation omitted). HAR 26(C) plainly states that "[s]anctions imposed against a plaintiff will be deducted from any award rendered"—not that sanctions may be imposed *only* if plaintiff obtains a recovery. Obviously, if the nonprevailing plaintiff recovers nothing in the trial *de novo,* the sanctions imposed would be deducted from "zero," thus, leaving only the amount of sanctions to be paid by the nonprevailing party to the prevailing party.

Furthermore, the Richardsons' interpretation of HAR 26(C) could lead to absurd and unjust results. We agree with Sport Shinko that, according to the Richardsons' logic, plaintiffs could pursue frivolous or unreasonable appeals all the way through trial *de novo* with impunity to sanctions under HAR 26 as long as the plaintiff failed to recover any monies from which sanctions could be deducted. Such a construction is clearly contrary to the purpose and intent of the CAAP. Therefore, we reject the Richardsons' interpretation of HAR 26(C).

### 3. Constitutionality of HAR 26

The Richardsons argue that HAR 26 is constitutionally infirm. Although the Richardsons specifically invoke the equal protection clause of the fourteenth amendment to the United States Constitution,[21] their argument also implicates article I, § 13 of the Hawai'i Constitution, which secures the right to a trial by jury in certain civil cases.

### a. *Right to Trial by Jury in Civil Cases*

■ We deal first with the Richardsons' claim that HAR 26 "impermissibly infringes their constitutional right to a jury trial." The resolution of this issue necessarily rests upon the interpretation of state law because the federal right to a jury trial in civil cases, secured by the seventh amendment to the United States Constitution does

---

20. The Richardsons do not take any position with regard to Mr. Richardson's recovery. Furthermore, the Richardsons have not alleged that the amount of the sanctions actually imposed in this case was excessive.

21. Curiously, the Richardsons claim HAR 26 "violates the Equal Protection Clause of the *6th* and

Fourteenth Amendments." We can only presume that the Richardsons' reference to the sixth amendment to the United States Constitution, which guarantees, *inter alia,* the right of an accused to a jury trial in *criminal* prosecutions, was in error.

not apply to the states. *Lum v. Sun*, 70 Haw. 288, 294, 769 P.2d 1091, 1095 (1989); *Lii v. Sida of Hawaii, Inc.*, 53 Haw. 353, 355, 493 P.2d 1032, 1033, *cert. denied*, 408 U.S. 930, 92 S.Ct. 2493, 33 L.Ed.2d 342 *reh'g denied*, 409 U.S. 903, 93 S.Ct. 107, 34 L.Ed.2d 166 (1972) (per curiam); *Harada v. Burns*, 50 Haw. 528, 532, 445 P.2d 376, 380 (1968) (citations omitted).

Article I, § 13 of the Hawai'i Constitution, as amended in 1978, provides in relevant part: "In suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved." HRCP 38(a) (1990) reaffirms this right, providing: "The right of trial by jury as given by the Constitution or a statute of the state or the United States shall be preserved to the parties inviolate." This court has acknowledged that article I, § 13 and HRCP 38(a) were patterned after the seventh amendment and FRCP 38(a), respectively, and we have therefore deemed the interpretation of those provisions by the federal courts highly persuasive in construing the right to a civil jury trial in Hawai'i. *Harada*, 50 Haw. at 532 & n. 1, 445 P.2d at 380 & n. 1.

Although trial by jury in civil cases is a "fundamental" right in the State of Hawai'i, *see Lee Wing Chau v. Nagai*, 44 Haw. 290, 293–94, 353 P.2d 998, 1000 (1960) [22] the right has never been construed so broadly as to prohibit reasonable conditions upon its exercise. Instead, it has been held that "the limitation imposed by the [seventh] amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *Kimbrough v. Holiday Inn*, 478 F.Supp. 566, 568 (E.D.Penn.1979) (quoting *Ex Parte Peterson*, 253 U.S. 300, 309–310, 40 S.Ct. 543, 546, 64 L.Ed. 919 (1920)).

Moreover, in holding that a procedure for non-judicial determinations prior to jury trial does not violate the seventh amendment, the United States Supreme Court has stated that

the seventh amendment "does not prescribe at what stage of an action a trial by jury must, if demanded, be had; or what conditions may be imposed upon the demand of such a trial, consistently with perserving the right to it." *Id.*, 478 F.Supp. at 569 (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 23, 19 S.Ct. 580, 589, 43 L.Ed. 873 (1899)). Thus, with regard to mandatory arbitration programs that afford a right to trial *de novo*, it has been held that

> [t]he only purpose of the [seventh amendment] is to secure the right of trial by jury before rights of person or property are *finally* determined. All that is required is that the right of appeal for the purpose of presenting the issue to a jury must not be burdened by the imposition of onerous conditions, restrictions or regulations which would make the right practically unavailable.

*Id.*, 478 F.Supp. at 570 (quoting *Application of Smith*, 381 Pa. 223, 112 A.2d 625 (1955), *appeal dismissed sub nom., Smith v. Wissler*, 350 U.S. 858, 76 S.Ct. 105, 100 L.Ed. 762 (1958)) (emphasis in original).

■ Thus, laws, practices, and procedures affecting the right to trial by jury under article I, § 13 are valid as long as they do not significantly burden or impair the right to ultimately have a jury determine issues of fact. In the present case, however, the Richardsons contend that, although they received a jury trial, the "specter of sanctions" created by HAR 26 impermissibly burdened their *exercise* of that right. We disagree.

In discussing the Richardsons' jury trial rights under article I, § 13, we note that the Richardsons' challenge to HAR 26 could be analyzed under the rubric of substantive due process. Characterized differently, the Richardsons claim that HAR 26 is constitutionally flawed because its sole purpose is to penalize litigants who exercise their right to a jury trial. In that regard, the United States Supreme Court has cautioned that "[t]o punish a person because he has done what the law

---

**22.** *Cf. Melancon v. McKeithen*, 345 F.Supp. 1025, 1045 (E.D.La.1972), ("[a] civil jury trial is not so implicit within the concept of ordered liberty in a cooperative federalism as to be required of the

states by due process" (internal quotations and brackets omitted)), *aff'd sub nom., Hill v. McKeithen*, 409 U.S. 943, 93 S.Ct. 289, 34 L.Ed.2d 214 (1972).

plainly allows him to do is a due process violation of the most basic sort." *Borden-kircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (citation omitted), *reh'g denied,* 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978). We believe, however, that essentially the same analysis is involved in examining whether HAR 26 violates due process or article I, § 13.

For example, in *United States v. Jackson,* 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the United States Supreme Court declared unconstitutional a provision of the Federal Kidnapping Act that authorized imposition of the death penalty only if recommended by a jury; thus, an accused who waived his or her right to jury trial or pleaded guilty was assured of avoiding capital punishment. The Supreme Court stated:

> Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert the right to contest their guilt before a jury. The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional.

*Id.* at 581, 88 S.Ct. at 1216 (footnote omitted). Although the Supreme Court determined that the goal of limiting the death penalty to cases in which a jury recommends it to be "an entirely legitimate one[,]" it held that the objective "cannot be pursued by means that needlessly chill the exercise of basic constitutional rights.... [Consequently,] the question is whether [the chilling] effect is unnecessary and therefore excessive." *Id.* at 582, 88 S.Ct. at 1216 (citations omitted). Additionally, having determined that the goal of the subject provision could be achieved by other means "without penalizing those defendants who plead not guilty and demand jury trial[,]" the Court concluded that "the Federal Kidnapping Act cannot be justified by its ostensible purpose." *Id.* at 582–83, 88 S.Ct. at 1217.

Following that decision, however, the United States Supreme Court has steadfastly refused to adopt a broad reading of *Jackson.* See *Fuller v. Oregon,* 417 U.S. 40, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974); *Ludwig v. Massachusetts,* 427 U.S. 618, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976); *Corbitt v. New Jersey,* 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978). Specifically, in *Corbitt,* the Court declared that "[t]he cases in this Court since *Jackson* have clearly established that not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." *Id.* at 218, 99 S.Ct. at 497 (footnote omitted). Thus, courts have interpreted the post-*Jackson* Supreme Court cases to require, as a constitutional minimum, only that laws affecting the sixth amendment right to jury trial must have a legitimate purpose and must not impermissibly burden the exercise of the right. See, e.g., *United States v. Palmer,* 809 F.2d 1504, 1508 (11th Cir.1987); *United States v. Wyman,* 724 F.2d 684, 688–89 (8th Cir.1984); *United States v. Chavez,* 627 F.2d 953, 957 (9th Cir.1980), *cert. denied,* 450 U.S. 924, 101 S.Ct. 1376, 67 L.Ed.2d 353 (1981).

Accordingly, as applied to the case before us, if HAR 26 serves a legitimate purpose and does not impermissibly burden the Richardsons' civil jury trial right, there is no violation of due process or article I, § 13.

As evidenced from our previous discussion, HAR 26 serves a necessary and legitimate purpose. Moreover, as we shall discuss, HAR 26 achieves its objectives by reasonable means inasmuch as the authorized sanctions are limited in both amount and application.

First, HAR 26 sanctions are available only if the appealing party does not improve its position, at the present time, by 15% or more, and even then, sanctions are *discretionary.* Accordingly, every party has the ability to avoid HAR 26 sanctions by undertaking a frank post-arbitration evaluation of the merits of their case.

Second, the potential magnitude of the sanction is not *per se* unreasonable. Sanctions are presently limited to $5,000.00 in attorneys' fees plus actual "costs" as that

term is defined.[23] Many courts have upheld similar or greater potential sanctions as reasonable. *See Christie–Lambert Van & Storage Co. v. McLeod,* 39 Wash.App. 298, 693 P.2d 161 (1984) (relevant statute provided that court "shall" assess costs and "reasonable" attorneys' fees against party who appeals and fails to improve arbitration award); *Firelock, Inc. v. District Court,* 776 P.2d 1090, 1097 (Colo.1989) ("provision for the payment of costs of arbitration if the party does not increase its position by 10% is not an unreasonable burden on the availability of a jury trial"). The Pennsylvania Supreme Court has also held that no "onerous" restriction on the right to jury trial was presented by a compulsory arbitration statute that discouraged frivolous appeals "by providing for the imposition of all costs of both arbitration and trial, which includes the expenses of expert witnesses on the losing party if the trial court finds that the basis for the appeal was capricious, frivolous and unreasonable." *Parker v. Children's Hosp. of Philadelphia,* 483 Pa. 106, 120, 394 A.2d 932, 939 (1978).

■ However, although the amount of sanctions authorized by HAR 26 is not *per se* unconstitutional, "the problem is one of degree rather than kind." *Christie–Lambert,* 39 Wash.App. at 307, 693 P.2d at 167. For example, as the Pennsylvania Supreme Court has noted with regard to a court rule requiring the payment of arbitrators' fees as a condition to post-arbitration jury trial:

> [T]he necessity of paying [$75 in arbitrators' fees] as the condition for the right to appeal [from a mandatory arbitration award] would seemingly operate as a strong deterrent, amounting practically to a denial of that right, if the case should involve only ... as little as $250.

*Application of Smith,* 381 Pa. at 232, 112 A.2d at 630. Thus, the amount of sanctions imposed in a given case must not be so disproportionate to the amount in controversy so as to operate as a practical denial of the right to a jury trial in civil cases.

In the present case, the amount in controversy was arguably between $60,441.80 (the arbitration award) and $150,000.00 (the amount the Richardsons demanded in their settlement conference statement filed in the circuit court). Although no fixed lines can be drawn, we do not believe the $5,234.41 sanction was unreasonable.[24] *Cf. Christie–Lambert,* 39 Wash.App. at 500, 693 P.2d at 163 (appellate court ordered sanction of $3,000 in attorneys' fees plus costs against party that had failed in trial *de novo* to improve on $3,045.42 arbitration award entered against him).

When considering the important interests that HAR 26 serves and the limits placed on its use, we cannot say that HAR 26 imposed an unreasonable burden on the Richardsons' right to a civil jury trial. Therefore, we conclude that the sanctions awarded in this case did not violate due process or article I, § 13.

#### b. *Equal Protection of the Laws*

■ Finally, the Richardsons claim that their right to equal protection of the laws under the fourteenth amendment to the United States Constitution was violated "to the extent that [HAR 26] is applied only to a limited class of tort victims exercising their right to a jury trial[.]" Despite their focus on HAR 26, the Richardsons essentially challenge the constitutional validity of the following classification made by HRS § 601–20(b) (1992), which provides: "All civil actions in tort, having a probable jury award value, not reduced by the issue of liability, exclusive of interests and costs, of $150,000 or less, shall be submitted to the [CAAP]." Thus, litigants compelled to participate in the CAAP by HRS § 601–20(b) are subject to HAR 26 sanctions if they exercise their right to a jury trial while other litigants are not. We must first determine the level of scrutiny to apply in considering the validity of HRS § 601–20(b). This determination requires "[a]n ex-

---

23. HAR 26 costs may include those costs incurred by the party but "not otherwise taxable under the law" and costs of jurors. HAR 26(B).

24. Although the Richardsons have not alleged that the amount of the sanctions actually imposed in this case was excessive, we note that the sanctioned party's ability to pay sanctions in any type of case may be a relevant factor to consider among the totality of circumstances when determining the amount of sanctions to be imposed.

amination of the character of the classification and the individual interests affected by it[.]" *State v. Petrie*, 65 Haw. 174, 177, 649 P.2d 381, 384 (1982). " 'Where suspect classifications or fundamental rights are not at issue, this court has traditionally employed the rational basis test.' " *Baehr v. Lewin*, 74 Haw. 530, 572, 852 P.2d 44, 64, *reconsideration and clarification granted in part*, 74 Haw. 645, 875 P.2d 225 (1993) (citations omitted); *accord New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

▪ Because trial by jury is a fundamental right, the Richardsons argue that any abridgement of that right under article I, § 13 must be subject to strict scrutiny. We disagree. Strict scrutiny is appropriate only "[w]hen a statutory classification *significantly interferes* with the exercise of a fundamental right[.]" *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978) (emphasis added); *see also MacGuire v. Houston*, 717 P.2d 948, 952–53 (Colo.1986) ("[o]nly significant and substantial restraints on the [fundamental right of] freedom of association [for political purposes] require strict scrutiny[;]" restriction at issue affecting that right was "not of such a character and magnitude to require strict scrutiny") (citing, *inter alia, Kusper v. Pontikes*, 414 U.S. 51, 57–59, 94 S.Ct. 303, 307–09, 38 L.Ed.2d 260 (1973)). Further, classifications based on monetary amounts are not "suspect." *See generally, Firelock, Inc.*, 776 P.2d at 1098–99. Because mandatory participation in the CAAP by itself does not significantly interfere with a party's constitutional right to a jury trial, strict scrutiny of HRS § 601–20(b) is not warranted, and we will apply the rational basis test instead. *Baehr*, 74 Haw. at 572, 852 P.2d at 64.

▪ " 'Under the rational basis test, we inquire as to whether a statute rationally furthers a legitimate state interest.' " *Id.* (citations omitted).

> In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, [a court] must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?

*Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981); *accord Kaneohe Bay Cruises, Inc. v. Hirata*, 75 Haw. 250, 260, 861 P.2d 1, 7 (1993). In reviewing these questions, we pay heed to the general principle that under the rational basis test, "[e]very enactment of the legislature carries a presumption of constitutionality[.]" *State v. Petrie*, 65 Haw. 174, 175, 649 P.2d 381, 382 (1982) (citations omitted); *see Baehr*, 74 Haw. at 572 n. 28, 852 P.2d at 64 n. 28. Further, where the rational basis test applies to a party's challenge of a statute on equal protection grounds, the presumption must be overcome by proof beyond a reasonable doubt. *Petrie*, 65 Haw. at 179, 649 P.2d at 385.

As stated previously, the purpose of the CAAP is "to provide for a procedure to obtain prompt and equitable resolution of certain civil actions in tort through arbitration." HRS § 601–20(a) (1992); *see also* HAR 2(A). We hold that the purpose is a legitimate one. We turn our inquiry then to whether it was reasonable for the legislature to believe that assigning to the CAAP only tort actions having a probable jury award value of $150,-000.00 or less would promote its objectives. *Western & Southern Life*, 451 U.S. at 668, 101 S.Ct. at 2083; *Kaneohe Bay*, 75 Haw. at 260, 861 P.2d at 7. In doing so, we "will only seek to determine whether any reasonable justification can be conceived to uphold the legislative enactment." *Kaneohe Bay*, 75 Haw. at 260, 861 P.2d at 7 (citation omitted) (emphasis omitted). The § 601–20(b) classification passes this examination.

First, the legislature could reasonably believe that actions involving more than $150,-000.00 would generally require arbitration proceedings of greater length than those intended to be produced by the CAAP, and that "the cost of a subsequent trial ... [would be] very small, relative to the claim itself." *See Kimbrough*, 478 F.Supp. at 576 (quoting "Statement of Attorney General Griffin Bell before the Committee on the

Judiciary Concerning Arbitration on April 14, 1978").

Second, it is fair to presume as a general matter that tort cases will involve only claims for money damages. "In such cases, often the only dispute is over the amount of money owed by one party to the other. In contrast, pleas for equitable relief would probably mean increased complexity and could require the continuing supervision of the court. Such cases would be inappropriate for arbitration." *Id.*

Because the § 601–20(b) classification conceivably furthers the CAAP's objectives, we need look no further. *See Daoang v. Department of Educ.*, 63 Haw. 501, 504–06, 630 P.2d 629, 631–32 (1981) ("[i]f a statute furthers a stated objective even to the slightest degree, this court will affirm its validity").

Accordingly, we hold that HRS § 601–20(b) does not violate the equal protection clause of the fourteenth amendment.

## III. *CONCLUSION*

Based on the foregoing, we affirm both the judgment and award of sanctions against the Richardsons.