992 P.2d 50

**Terri–Lynn STENDER, Individually and as Next of Friend to Stephen I. Adams–Stender and Sheryl–Lynn A. Adams Stender, Respondents–Plaintiffs–Appellants/Cross-Appellees,**

v.

**Charles K. VINCENT, Jr.; State of Hawai'i; and City and County of Honolulu, Defendants-Appellees,**

and

**Ford Motor Company, Petitioner-Defendant–Appellee/Cross–Appellant,**

and

**John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.**

No. 20784.

Supreme Court of Hawai'i.

Jan. 31, 2000.

Bertram Goldstein, Richard Turbin, and Laura Stone–Jeraj, on the briefs, for respondent-plaintiffs-appellants/cross-appellees Terri–Lynn Stender, Individually and as Next of Friend to Stephen I. Adams-Stender and Sheryl–Lynn A. Adams–Stender.

Jerold T. Matayoshi, Honolulu, Robert Sadaoka, and Kathleen Clark, on the briefs, for petitioner-defendant appellee/cross-appellant Ford Motor Company.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by NAKAYAMA, J.

On July 19, 1999, petitioner-defendant-appellee/cross-appellant Ford Motor Co. (Ford) filed a petition for a writ of certiorari seeking review of the summary disposition order filed by the Intermediate Court of Appeals (ICA) on June 17, 1999. In the order, the ICA vacated the circuit court's judgment against Terri–Lynn Stender (Stender), individually and as next friend of her children, Steven and Sheryl–Lynn Adams Stender (collectively, plaintiffs), in a case involving, *inter alia*, product liability and negligence claims against Ford for defective design. This court granted certiorari to review Ford's petition. Upon review of the parties' arguments before this court and the record presented, we hold that the ICA erred in vacating the circuit court's judgment based on an adverse inference jury instruction given by the trial court as a spoliation sanction against plaintiffs. Nevertheless, insofar as we agree with the ICA that the circuit court erred by partially denying plaintiffs' motion to exclude Ford's supplemental discovery responses, and because we further believe that this error provides an independent and suffi-

cient basis for a new trial, we uphold the ICA's decision to vacate the circuit court's judgment, albeit on different grounds. In all other respects, we affirm the ICA's order.

## I. BACKGROUND

### A. *Accident and Preliminary Events*

In the early morning hours of March 22, 1992, Stender and Darrell Perysian were parked in a 1984 Ford Tempo (Tempo) owned by Eugenia Stender (Eugenia), Stender's mother, at the Makapu'u Lighthouse lookout on the island of O'ahu in the City and County of Honolulu. Stender sat in the driver's seat and Perysian sat in the passenger's seat.

Defendant-appellee Charles Vincent, Jr. (Vincent) was traveling northbound on Kalaniana'ole Highway at speeds approximated at over 70 miles an hour. In an attempt to pass slower moving vehicles, Vincent crossed the center line and accelerated. While still passing the vehicles, Vincent saw headlights and attempted to avoid a head-on collision. Vincent lost control of his vehicle and veered into the lookout, striking the left front area of the Tempo. The collision fractured the Tempo's front axle and sent the vehicle into a 180–degree spin. Stender was rendered quadriplegic.

The position of Stender's seat back at the time of the accident is an issue of contention. On March 25, 1992, Perysian made unsworn audiotaped statements to Teryn Loo (Loo), an insurance adjuster with Allstate Insurance Company (Allstate). The transcript reads in relevant part:

[Loo]: Okay. Can you tell me—you said the two of you—[Stender] turned off the ignition, she had parked, was facing forward or was she—

[Perysian]: She had her feet up on top of the steering wheel as we were talking, with the seat backs down and—

[Loo]: They were reclined then?

[Perysian]: Yeah, they were reclined. No, not fully reclined cause they don't fully recline those chairs or whatever. . . .

In his September 22, 1994 deposition, however, Perysian denied that Stender had reclined her seat at any time after she had parked the car. At trial, Stender testified that she had been sitting with her seat upright and her left leg resting on the dashboard.[1]

On March 27, 1992, Stender, with the assistance of a lawyer (first attorney), executed a general power of attorney appointing Eugenia as her attorney in fact. The precise scope of the attorney-client relationship between Stender and first attorney remains disputed. The attorney admitted, however, that he was Stender's counsel as of March 27, 1992.

With Stender's permission, the first attorney hired an investigator to examine, *inter alia,* the "crashworthiness" of the Tempo. On March 30, 1992, the investigator inspected and photographed the vehicle. He noticed a deformation in the driver's seat back and informed the first attorney of this finding in an April 6, 1992 meeting. According to the investigator's records, the first attorney expressed interest in "that seat back thing." No arrangements were made to preserve the vehicle.

On April 1, 1992, Eugenia settled her property damage claim with Allstate concerning the Tempo. As part of the settlement, Allstate paid Eugenia $1880 and obtained the Tempo for salvage. Sometime later, the vehicle was scrapped.

On January 29, 1993, Stender filed a complaint against Vincent and unknown Doe and Roe defendants. The complaint included claims for relief sounding in negligence and products liability.

On July 22, 1993, Richard Turbin replaced the first attorney as Stender's counsel. On October 27, 1993, plaintiffs filed an amended complaint adding Ford, the State of Hawai'i, and the City and County of Honolulu as

---

1. Plaintiffs also presented eyewitnesses who testified that, after the accident, Stender's seat was "laid back" or reclined to a certain degree. It is unclear however, whether this condition preceded the accident or resulted from it.

defendants[2] and Stender as next friend of Stephen and Sheryl–Lynn Adams–Stender. Plaintiffs also added a product liability claim against Ford based on alleged design defects in the front seats of the Tempo. Trial was scheduled for October 7, 1996, with a discovery cutoff date of September 7, 1996.

In a February 16, 1995 deposition, Alan Cantor (Cantor), an expert witness for plaintiffs, opined that the Tempo's seat back was defectively designed because it lacked dual recliner mechanisms. Because the seat back was not strong enough, Cantor asserted, it failed in the collision and caused Stender's injuries.

### B. *Motion to Dismiss/Sanction Order*

On September 6, 1996, Ford filed a motion to dismiss plaintiffs' action, to preclude introduction of plaintiffs' expert testimony, or to impose other sanctions for spoliation of evidence (motion to dismiss). Plaintiffs filed a memorandum opposing the motion on September 25, 1996.

On the same day that it filed the motion to dismiss, Ford also filed a motion to compel the further deposition of Cantor.[3] On September 9, 1996, the circuit court orally granted the motion to compel and scheduled Cantor's deposition for September 12, 1996. The circuit court also ordered that the deposition of Ford's liability expert, Priya Prasad, Ph.D. (Dr. Pradad), be rescheduled from September 12 to September 23, 1996.

In his September 12 deposition, Cantor opined that a failure of the head rest on Stender's seat could also have contributed to Stender's injuries. On September 27, in his continued deposition, Cantor further stated that, based on tests conducted on September 18 and 25, 1996, a pre-existing crack at the bolt hole in the seat bottom frame caused Stender's injuries and that different seat tracks and a strengthened seat back would have prevented the injuries.

After a hearing on October 1, 1996, the motions court granted in part and denied in part Ford's motion to dismiss. The written order (sanction order) stated in relevant part:

THE COURT HEREBY ENTERS THE FOLLOWING FINDINGS:

1. Plaintiffs' prior counsel and [p]laintiffs' retained investigator may have more aggressively considered a product liability claim and could have taken affirmative steps to preserve the [Tempo]. However, in light of the circumstances of the case, the court deems that dismissal of [plaintiffs'] claim against [Ford] would be too severe a sanction.

2. [Ford] will have the benefit of argument, cross[-]examination, and a jury instruction as to the burden of proof, and the weight of the evidence, as well as other curative measures to mitigate against the prejudice that this court finds Ford has suffered by spoliation of [the Tempo].

3. Since Ford has been denied full opportunity to defend on the issue of product liability, the following are imposed as sanctions in the interest of fairness.

THE COURT HEREBY ORDERS THAT:

1. [Ford's] request to dismiss [p]laintiffs' claim is denied.

2. Plaintiffs' claim shall be limited to defect in design. Plaintiffs are precluded from claiming a defect in the manufacturing of [the Tempo] seat.

3. The taped and transcribed statement of [Perysian] to [Loo] on March 25, 1992, attached as Exhibit "L" to Ford's motion to dismiss, is admitted in its entirety.

4. The deposition testimony of [Perysian] of September 22, 1994, taken in Phoenix, Arizona, may not be used by [p]laintiffs. Plaintiffs may not call him as a witness in this case.

5. The testimony of the experts who testify regarding the condition of Ford Tempos and [the Tempo] will be held to a reasonable engineering probability.

---

**2.** Plaintiffs dismissed their claims against the State and the City before trial.

**3.** The parties had informally agreed, on August 14, 1996, to extend the discovery deadline to allow further expert depositions.

6. [Cantor] will not be permitted to testify to any opinion given relating to the head[ ]rest, and this was in his deposition of September 12, 1996, or to a pre-existing crack at the bolt hole in the seat bottom frame[, and t]his was in the deposition of September 27, 1996, but will be allowed to testify to any opinion rendered, findings made or experiments conducted before September [7, 1996].

### C. Ford's "Supplemental" Document Production

During Cantor's September 12, 1996 deposition, Ford produced a "supplemental" response to plaintiffs' discovery requests consisting of over 10,000 documents and 20 videotapes in two banker's boxes. On September 27, Ford delivered two more banker's boxes of documents.[4] Most of the documents in these productions derived from an "ongoing study" by Dr. Prasad and others that Ford termed the "rear impact project."

On October 11, 1996, plaintiffs filed a motion in limine seeking to exclude Ford's supplemental productions from evidence. On October 14, 1996, the trial court granted the motion with respect to the September 27 documents, but denied the motion with respect to the September 12 documents. The trial court explained that "[plaintiffs] did have an opportunity to question Dr. Prasad on September the 23rd regarding these materials and had an opportunity to review the . . . production."

### D. Trial and Judgment

Trial began on October 21, 1996.[5] On November 6, Ford filed a motion for directed verdict on all of plaintiffs' claims, arguing, inter alia, that plaintiffs could not sustain their burden of proof on the products liability claim because they failed to adduce evidence that the Tempo had not been substantially altered after it left Ford's possession. The trial court denied the motion.

On November 13, 1996, the trial court entered a directed verdict against Vincent on the issue of liability. In instructing the jury on the remaining issues, the trial court gave the following adverse inference instruction with respect to Ford:

The court has found that Plaintiffs' prior counsel and Plaintiffs' retained investigator could have taken affirmative steps to preserve [the Tempo]. As a result, [Ford] was denied the opportunity to inspect [the Tempo] after the accident and has therefore been denied full opportunity to defend itself in this case. Had Ford been allowed to inspect [the Tempo], Ford could have examined the subject seat for evidence showing that the seat was in the recline position just prior to the accident, as well as evidence showing that the seat did not fail as Plaintiffs' expert claims it did. Plaintiffs' prior counsel's and retained investigator's failure to preserve [the Tempo] has prevented Ford from testing the accuracy and credibility of Plaintiffs' claims that the seat was in the upright position just before the accident and that the seat failed during the accident.

As a result, *I instruct you that you may, but are not required, to draw the inference that had [the Tempo] been available for inspection by [Ford] in this case, Ford could have found evidence showing that the seat did not fail during the accident.*

(Emphasis added.) The trial court also instructed the jury that it was to consider Perysian's unsworn statement "as if it had been given in Court."

On November 14, 1996, the jury returned a verdict in favor of Ford and against plaintiffs on liability. The jury also returned a special verdict in favor of plaintiffs and against Vincent on damages, awarding Stender $2,200,-000 and Stephen and Sheryl $100,000 each. Final judgment was entered on June 20, 1997.

---

**4.** Neither the September 12 nor September 27 productions are included in the record on appeal. Plaintiffs, however, attached an index of the September 12 production, apparently prepared by plaintiffs in preparation for their deposition of Dr. Prasad, to their motion to exclude these documents. Ford does not dispute the

quantity and general content of the two supplemental productions.

**5.** The trial date was postponed for reasons unrelated to the supplemental production.

## E. *The ICA's Decision*

Both Ford and plaintiffs timely appealed, and the case was assigned to the ICA. On appeal, plaintiffs contested the sanction order, arguing that the motions court erred in: 1) finding that plaintiffs were culpable in failing to preserve the Tempo; 2) admitting Perysian's unsworn, tape-recorded statement, excluding his deposition testimony, and barring him as a witness; and 3) excluding any findings or opinions rendered by Cantor after the discovery cutoff date of September 7, 1996. Plaintiffs also argued that the trial court erred in: 1) exceeding the scope of the sanction order by a) giving the adverse inference instruction and b) instructing the jury to consider Perysian's unsworn statement "as if it had been given in Court;" 2) admitting evidence produced by Ford after the discovery cutoff date; and 3) denying plaintiff's motion for a partial new trial on damages. Ford, in its cross-appeal, argued that the trial court erred in not granting Ford's motion for a directed verdict.

On June 17, 1997, the ICA, via summary disposition order, vacated in part the judgment of the circuit court, remanding for retrial of the liability portion of plaintiff's claims against Ford. The ICA also ruled that, on retrial, the court should exclude the documents produced by Ford after the discovery cutoff date. In all other respects, the ICA affirmed the circuit court's judgment. The ICA's order stated:

### SUMMARY DISPOSITION ORDER

Upon review of the record and briefs, and having duly considered the arguments raised by the parties and the law relevant to the issues on appeal,

We conclude on the appeal by [plaintiffs] as follows:

1. The first circuit court (the court) erred in denying that part of [plaintiffs]' eighth motion in limine requesting exclusion from evidence of the September 12, 1996 supplemental production of discovery by [Ford];

2. The court erred in giving a negative inference instruction to the effect that "had the subject Tempo been available for inspection by ... Ford ... in this case, Ford could have found evidence showing that the seat was in the reclined position prior to the accident [and] that the seat did not fail during the accident[;]" and,

3. The court did not err in denying [plaintiffs]' motion for a new trial on the grounds of the inadequacy of awarded damages, and accordingly, the award of damages is affirmed.

IT IS HEREBY ORDERED that the June 20, 1997 final judgment in favor of Ford and against [plaintiffs] is vacated to the extent that the case is remanded for retrial of the liability portion of [plaintiffs]' negligence and strict liability claims against Ford, and the apportionment between Ford and Defendant Charles K. Vincent, Jr. of the damages award by the jury's November 14, 1996 special verdict in the event that on retrial Ford is determined to be liable to [plaintiffs]. On retrial, only evidence produced up to and including September 7, 1996, the discovery cutoff date, shall be admitted at trial, if otherwise admissible.

On Ford's cross-appeal, we conclude that the court correctly denied Ford's motion for a directed verdict on [plaintiffs]' negligence and strict liability claims.

(Footnote omitted and some brackets added.)

In its application for a writ of certiorari, Ford argues that the ICA erred in vacating the judgment of the circuit court. Specifically, Ford contends that the trial court did not err in giving the adverse inference instruction and partially denying plaintiff's motion to exclude Ford's supplemental production. Ford also maintains that the trial court should have granted a directed verdict in its favor.

## II. DISCUSSION

### A. *Adverse Inference Jury Instruction*

 Ford first challenges the ICA's holding that the circuit court erred in instructing the jury that it "may ... draw the inference that[,] had [the Tempo] been available for inspection by [Ford] in this case, Ford could have found evidence showing that the seat did not fail during the accident."

According to Ford, such an adverse inference instruction lay well within the court's authority to sanction plaintiffs for the spoliation of evidence in this case. This court reviews the circuit court's imposition of sanctions for discovery abuse, including the spoliation of evidence, under the abuse of discretion standard. *See Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997) (quoting *Wong v. City and County of Honolulu*, 66 Haw. 389, 394, 665 P.2d 157, 161 (1983)). "A [circuit] court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Id.* (quoting *Aloha Unlimited, Inc. v. Coughlin*, 79 Hawai'i 527, 532–33, 904 P.2d 541, 546–47 (App.1995)).

■ We have recognized that the circuit court has wide-ranging authority to impose sanctions for the spoliation of evidence. Hawai'i Rules of Civil Procedure (HRCP) Rule 37(b)(2) allows the court to "make such orders ... as are just," including the dismissal of claims, in response to discovery violations. *See, e.g., Wong*, 66 Haw. at 392–94, 665 P.2d at 160–62.[6] In addition to this rule, the circuit court also "has the *inherent power* ... to fashion a remedy to cure prejudice suffered by one party as a result of another party's loss or destruction of evidence." *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 507–08, 880 P.2d 169, 182–83 (1994). *See also* HRS § 603–21.9(6) (1993). Such a remedy may include a jury instruction such as the one given by the trial court in this case. *See id.* at 508, 880 P.2d at 183 (holding that the trial court had the authority to give an instruction "if it deemed such a measure appropriate"). *See generally Trevino v. Ortega*, 969 S.W.2d 950, 954–961 (Tex. 1998) (concurring opinion) (presenting a comprehensive overview of the law on spoliation sanctions).

■ In the instant case, in addition to challenging the sanctions imposed by the circuit court as excessive,[7] plaintiffs argued that the trial court erred by exceeding the scope of the motions court's original sanction order, thereby violating the "law of the case" doctrine. *See Wong*, 66 Haw. at 396, 665 P.2d at 162.

We have recognized in the past that the doctrine of "law of the case" is a rule of practice based on considerations of efficiency, courtesy, and comity. *Wong* [, *supra* ]. Therefore, "[u]nless cogent reasons support the second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction will be deemed an abuse of discretion." *Id.* at 396, 665 P.2d at 162 (citations omitted) (emphasis in original). The rule announced in *Wong*, however, does not preclude modification of prior rulings in all instances. *Matsushita v. Container Home Supply, Inc.*, 6 Haw.App. 439, 726 P.2d 273 (1986).

*Best Place, Inc. v. Penn America Ins. Co.*, 82 Hawai'i 120, 135, 920 P.2d 334, 349 (1996) (some brackets added).

The instant sanctions order provided that [Ford] will have the benefit of argument, cross[-]examination, and a jury instruction as to the burden of proof, and the weight of the evidence, *as well as other curative measures* to mitigate against the prejudice that this court finds Ford has suffered by spoliation of [the Tempo].

(Emphasis added.) Plaintiffs apparently interpret "other curative measures" as referring exclusively to the sanctions contained in the order. The motions court, however, included "other curative measures" among the list of general remedies available to Ford and did not expressly limit the sanctions to those enumerated. We do not believe that the motions court intended to restrict the trial court's access to such other sanctions as it

---

6. Generally, however, sanctions under Rule 37(b) do not apply unless a prior court order for discovery has been violated. *See Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994); *Glover v. Grace Pacific Corp.*, 86 Hawai'i 154, 163, 948 P.2d 575, 584 (App.1997).

7. Apart from opposing Ford's objection to the ICA's reversal of the adverse inference instruction, plaintiffs do not contest the spoliation sanctions before this court. Thus, with one exception, *see infra* note 8, we do not address the sanctions other than the adverse inference instruction.

might later deem appropriate. New evidence or developments could very well arise at trial, requiring further measures in response. Absent a clear indication that the motions court intended its order as a definitive and exclusive ruling on sanctions, we decline to give it such an interpretation. *Cf. Best Place*, 82 Hawai'i at 135–36, 920 P.2d at 349–50 (holding that the prior court's order, by its conditional terms, allowed subsequent modification by other courts). Thus, in this case, we hold that the "law of the case" doctrine did not bar the imposition of further sanctions by the trial court.

■ Moreover, the adverse inference instruction was not so excessive as to constitute an abuse of discretion. This court has identified several factors relevant to determining whether a discovery sanction is appropriate:

(1) the offending party's culpability, if any, in destroying or withholding discoverable evidence that the opposing party had formally requested through discovery; (2) whether the opposing party suffered any resulting prejudice as a result of the offending party's destroying or withholding the discoverable evidence; and (3) the inequity that would occur in allowing the offending party to accrue a benefit from its conduct.

*Kawamata Farms*, 86 Hawai'i at 243, 948 P.2d at 1084 (quoting *Richardson*, 76 Hawai'i at 507, 880 P.2d at 182).

In the sanctions order, the circuit court did not find plaintiffs directly at fault for the loss of the Tempo, but ruled that "[p]laintiffs' prior counsel and [p]laintiffs' retained investigator may have more aggressively considered a product liability claim and could have taken affirmative steps to preserve [the Tempo]." Plaintiffs maintain that, due to the lack of culpability on their part, the circuit court erred in giving the adverse inference instruction.

■ Plaintiffs first assert that no formal attorney-client relationship existed between Stender and her first attorney and that the "lawyer and investigator had no authority ... to allow the vehicle to be destroyed, or to abandon a potential products liability claim." Whether and to what extent an attorney-client relationship is present is a question of fact. *See Dietz v. Doe*, 131 Wash.2d 835, 935 P.2d 611, 615 (1997); *Admiral Merchants Motor Freight Inc. v. O'Connor & Hannan*, 494 N.W.2d 261, 265 (Minn.1992). In identifying the conduct of the first attorney and the investigator as a basis of its order, the circuit court implicitly found that an attorney-client relationship, or some other fiduciary relation, existed between Stender and her first attorney and that the relationship included representation with respect to the accident. *See generally Otaka, Inc. v. Klein*, 71 Haw. 376, 382, 791 P.2d 713, 717 (1990) (recognizing that, "where there is no express attorney-client relationship, there may exist nevertheless a fiduciary obligation or an implied professional relation" (citations, brackets, and ellipsis omitted)). We review circuit court findings of fact under the "clearly erroneous" standard. *In re Estate of Marcos*, 88 Hawai'i 148, 153, 963 P.2d 1124, 1129 (1998).

■ Here, although the first attorney attested that Stender never officially "retained" him, he admitted that he was her attorney from the time he assisted her with the execution of the power of attorney until he withdrew as counsel. With Stender's permission, the first attorney hired the investigator to examine the Tempo and to "pursue[ ] every aspect of this accident for the identification of viable defendants." The first attorney signed the original complaint in the present lawsuit as co-counsel. Based on these facts, we cannot say that the circuit court's finding was clearly erroneous. *Cf. Otaka*, 71 Haw. at 382–86, 791 P.2d at 717–19 (deciding that a fiduciary relationship existed between the attorney and litigant).

■ Plaintiffs also argue that they should not be penalized for the actions of their attorney and investigator, quoting *W.H. Shipman, Ltd. v. Hawaiian Holiday*, 8 Haw. App. 354, 364, 802 P.2d 1203, 1208, *cert. dismissed*, 71 Haw. 669, 833 P.2d 901 (1990) ("[T]he sins of [the] attorney should not have been visited on [the client]."). *Shipman*, however, involved a severe sanction of evidence preclusion that, under those circumstances, amounted to default judgment against the attorney's client. *See id.* We

agree that the trial court should bear in mind the culpability of the client in imposing sanctions for the attorney's conduct, particularly the ultimate sanction of dismissal or default judgment. *See, e.g., United States v. Shaffer Equip. Co.,* 11 F.3d 450, 462 (4th Cir.1993) (identifying, as one factor in its analysis, "the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients"); *Young v. Johnny Ribeiro Bldg., Inc.,* 106 Nev. 88, 787 P.2d 777, 780 (1990) (inquiring, *inter alia,* "whether sanctions unfairly operate to penalize a party for the misconduct of his or her attorney"). With respect to the instant adverse inference instruction, however, we do not believe that the circuit court abused its discretion in imputing the conduct of the first attorney and the investigator to the plaintiffs, in keeping with the general rule that, under "our system of representative litigation, . . . each party is deemed bound by the acts of his [or her] lawyer-agent." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 634, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962). *See also Johnson v. Allis Chalmers Corp.,* 162 Wis.2d 261, 470 N.W.2d 859, 868 (1991) ("Although . . . courts may exercise their discretion in appropriate cases by not punishing litigants for their counsel's errors or misconduct, . . . the litigant has no right to avoid the consequences of his attorney's conduct by disavowing the actions of counsel." (Citation omitted.)).

Plaintiffs insist that they "were not guilty of willful or contumacious conduct or any other acts of bad faith." Some courts have held that only bad faith or intentional misconduct will warrant an adverse inference that the lost evidence was unfavorable to the spoliator, because "[m]ere negligence . . . does not sustain an inference of consciousness of a weak case." *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir.1997) (quoting *Vick v. Texas Employment Comm'n,* 514 F.2d 734, 737 (5th Cir.1975)). *See also Brown v. Hamid,* 856 S.W.2d 51, 56–57 (Mo.1993); *State v. Langlet,* 283 N.W.2d 330, 333 (Iowa 1979). Other courts do not adhere to such a bright-line rule. *See Reilly v. Natwest Mkts. Group Inc.,* 181 F.3d 253, 268 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 940, 145

L.Ed.2d 818 (2000) ("a finding of bad faith or intentional misconduct is not a *sine qua non* to sanctioning a spoliator with an adverse inference instruction"); *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993) ("Surely a finding of bad faith will suffice [to support an adverse inference], but so will simple notice of potential relevance to litigation." (Citation and internal quotation marks omitted.)); *DeLaughter v. Lawrence County Hosp.,* 601 So.2d 818, 822 (Miss.1992) (jury may draw adverse inference based on deliberate *or* negligent loss of evidence); *Hamann v. Ridge Tool Co.,* 213 Mich.App. 252, 539 N.W.2d 753, 756–57 (1995), *appeal denied,* 454 Mich. 881, 562 N.W.2d 198 (1997) (exclusion of expert testimony justified even where evidence was unintentionally lost).

■ This court has never regarded bad faith or intentionality as a talisman in the imposition of discovery sanctions; we refuse to do so now. Discovery sanctions serve various purposes: punitive, deterrent, and remedial. *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999); *Bachmeier v. Wallwork Truck Ctrs.,* 507 N.W.2d 527, 533 (N.D.1993). Although non-intentional spoliation may not implicate the punitive and deterrent interests in sanctions and may not trigger the inference of consciousness of a weak case, it does create an unfair disadvantage with respect to the lost evidence. Indeed,

> [i]t makes little difference to the party victimized by the destruction of the evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is *adverse* . . . because the risk that the evidence would have been favorable should fall on the party responsible for its loss.

*Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991) (footnote omitted) (emphasis in original). *See also Hamann,* 539 N.W.2d at 756–57 ("Whether the evidence was destroyed or lost accidentally or in bad faith is irrelevant, because the opposing party suffered the same prejudice[.]"). We therefore hold that, while bad faith may certainly compel an adverse infer-

ence, the absence of bad faith may not necessarily preclude one.

■ "Destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Welsh v. United States,* 844 F.2d 1239, 1246 (6th Cir.1988). Within the bounds of its discretion, the circuit court has the flexibility to fashion an appropriate sanction based on the facts of the case. In the present case, the missing evidence was the very object that plaintiffs alleged caused Stender's injuries. Thus, although the circuit court found no bad faith or intentional misconduct on the plaintiffs' part, we cannot say that it abused its discretion by giving the adverse inference instruction. *Cf. Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 267 (8th Cir.1993) (affirming sanctions based on the trial court's finding that "both plaintiffs' expert and plaintiffs' attorney knew or should have known that the car was an important piece of evidence which should have been preserved in its entirety").

Plaintiffs further argue that Ford suffered no prejudice from the loss of the Tempo because plaintiffs alleged a *design defect* shared by all similarly designed Tempos. To be sure, the need for the actual defective product and, correspondingly, the prejudice caused by its loss, is significantly reduced in a case alleging a common design defect, as opposed to a particular manufacturing defect. *See Beerman v. Toro Mfg. Corp.,* 1 Haw.App. 111, 115, 615 P.2d 749, 753 (1980) (holding that plaintiffs did not need to identify the specific defective lawn mower to sustain their claim of a design defect); *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79–80 (3d Cir.1994) (recognizing that, because plaintiff alleged a design defect, the "need for immediate access to the particular saw involved in the accident was greatly diminished"). The instant case, however, raised complex questions of causation that Ford could not investigate because of the loss of the Tempo. *See Schmid,* 13 F.3d at 80 (observing that "plaintiff in a design defect case, in addition to proving a design defect, must prove that the defect caused his injury[,] and the defendant will want as much information as possible relevant to the issue of causation"). For example, Ford could not pursue its theory, supported by Perysian's statement to the insurance adjuster, that Stender's seat was reclined at the time of the accident. Foreclosed from examining the Tempo for any clues as to how the injury occurred, Ford's expert was required to construct and refute several alternative theories of the accident. Under these circumstances, the adverse inference instruction did not amount to an abuse of discretion.

■ For the above reasons, we hold that the adverse inference instruction fell within the scope of the trial court's inherent power "to curb abuses and promote a fair process." *Richardson,* 76 Hawai'i at 507, 880 P.2d at 182. Accordingly, we reverse the ICA's ruling that the trial court abused its discretion in giving the instruction.[8]

---

8. In its order, the ICA did not address plaintiffs' objection to the sanctions of admitting of Perysian's unsworn statement, to the exclusion of Perysian's deposition and potential trial testimony, and to the further instruction that the jury should consider the otherwise inadmissible hearsay "as if it were made in court;" plaintiffs, moreover, do not raise these matters before this court. Nevertheless, the foregoing sanctions deeply trouble us. First, although we have recognized that "a trial court has the power to take all reasonable steps short of dismissal, depending on the equities of the case," *Richardson,* 76 Hawai'i at 504, 880 P.2d at 179, we can find no case in which a trial court has devised comparable sanctions. The cases cited by Ford, in which courts excluded expert testimony based on missing evidence, *see, e.g., Unigard Sec. Ins. v. Lakewood Eng'g & Mfg.,* 982 F.2d 363, 368–69 (9th Cir.1992), are inapposite; here, Perysian was an eyewitness to the accident, not an expert who

formed opinions based on subsequent examination of the evidence.

Even assuming that the sanctions lay within the broader scope of the circuit court's powers, we do not believe that they were justified in this case. *See Turner,* 142 F.R.D. at 77 (holding that, "where the destruction was negligent rather than willful, special caution must be exercised to ensure that the [sanction] is commensurate with the information that was reasonably likely to have been contained in the destroyed evidence"). Besides Perysian's statement, Ford produced no evidence showing that Stender's seat was reclined. Even Perysian's statement was less than conclusive; Perysian explained that the seat "was not fully reclined cause [sic] they don't fully recline those chairs."

We believe that the evidence fails to provide an adequate basis for the above sanctions. Ultimately, however, we do not regard these errone-

B. *Ford's Supplemental Document Productions*

■ Ford also challenges the ICA's reversal of the trial court's partial denial of plaintiffs' motion to exclude Ford's supplemental production of documents. Preliminarily, plaintiffs styled their request as a "motion in limine," but based it on the rules of discovery. We thus construe the motion as a request for discovery sanctions,[9] the denial of which we review under an abuse of discretion standard. *See Kawamata Farms,* 86 Hawai'i at 241, 948 P.2d at 1082. *See also Thibeault v. Square D Co.,* 960 F.2d 239, 244 (1st Cir.1992) (recognizing the "rock solid basis" for such a deferential standard of review).

In their motion, plaintiffs cited HRCP Rule 26(e) (1990) and Rules of the Circuit Court of Hawai'i (RCCH) Rule 12(r) (1990). HRCP Rule 26(e)(1)(B) [10] requires parties to seasonably supplement discovery responses concerning the "identity of each person ex-

pected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony." Other courts have interpreted HRCP Rule 26(e)'s federal counterpart, Federal Rules of Civil Procedure (FRCP) 26(e) (1993),[11] as creating a self-executing, continuing duty to supplement, which the circuit court may enforce through sanctions imposed under its "inherent power." *See, e.g., Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir.1980) ("Few would question a court's inherent power to discipline breaches of Rule 26(e), even in the absence of a court order."). *See also* 1970 Advisory Committee Note to FRCP Rule 26(e) (explaining that sanctions for violations of the duty to supplement may include "exclusion of evidence, continuance, or other action, as the court may deem appropriate); 8 C. Wright, A. Miller & R. Marcus, *Federal Practice & Procedure: Civil 2d* § 1944 (1994).

Furthermore, at the time that plaintiffs filed their motion, RCCH Rule 12(r) [12] pro-

ous sanctions as sufficient grounds for a new trial, particularly in light of plaintiffs' failure to raise the issue before this court. *See Chung v. Kaonohi Ctr. Co.,* 62 Haw. 594, 603, 618 P.2d 283, 290 (1980) (appellate court may recognize error not properly raised on appeal "if error is plain and may result in a miscarriage of justice").

Nevertheless, because we vacate on other grounds, *see infra* Part II.B., we note the error in order to provide guidance on remand. The trial court shall reevaluate the sanctions relating to Perysian's testimony. Any sanctions imposed, however, must conform to the Hawai'i Rules of Evidence (HRE) (1993 and Supp.1998). We observe that, under the rules, Perysian's unsworn statement would be admissible only in response to any trial or deposition testimony previously admitted. *See* HRE Rule 802.1(1)(C) (as against trial testimony); HRE Rule 806 (as against deposition testimony).

9. So construed, plaintiffs were not obligated to object to the admission of the evidence at trial in order to preserve the issue on appeal. *See Lussier v. Mau–Van Development, Inc.* 4 Haw.App. 359, 393, 667 P.2d 804, 826 (1983) (explaining that, generally, even after the denial of a motion in limine, a party must still object to the admission of evidence at trial).

10. We note that, although plaintiffs specifically cited Rule 26(e)(2) in their motion, Rule 26(e)(1)(B), relating to the supplementation of expert testimony, appears to have been the relevant provision in this case. HRCP Rule 26(e) provides in relevant part:

(e) **Supplementation of responses.** A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under the duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

11. Prior to 1993, FRCP Rule 26(e) and HRCP Rule 26(e) were identical in terms. The 1993 amendment to FRCP Rule 26(e) considerably expanded the duty to supplement under federal procedure; HRCP Rule 26(e), however, has not changed in the interim. Accordingly, we primarily consult federal case law based on the pre-amendment version of FRCP Rule 26(e).

12. RCCH Rule 12(r) was amended in 1996 to provide for discovery cutoff sixty days before trial. The amendment applied only to cases "not

vided: "Discovery shall be cut off [thirty] days before the assigned trial date." Failure to comply with the rule was "deemed an undue interference with orderly procedures and unless good cause is shown, the court may ... impose sanctions in accord with [RCCH] Rule 12.1(a)(6)." RCCH Rule 12(t). Possible sanctions included dismissal of the action, entry of a default against the offending party, or "any other sanction as may be appropriate." RCCH Rule 12.1(a)(6) (1984).

Such rules, we have stated, "reflect a basic philosophy that a party to a civil action should be entitled to the disclosure of all relevant information in the possession of another person prior to trial, unless the information is privileged." *Wakabayashi v. Hertz*, 66 Haw. 265, 275, 660 P.2d 1309, 1315 (1983). This policy applies with particular force to expert testimony; "[t]he history of FRCP 26, which is highly persuasive in construing HRCP 26, ... makes it abundantly clear that complete and accurate pretrial discovery of expert witnesses is critical to fair trial[.]" *Lee v. Elbaum*, 77 Hawai'i 446, 454, 887 P.2d 656, 664 (App.1993), *cert. dismissed,* 77 Hawai'i 489, 889 P.2d 66 (1995) (citation omitted). As the United States Court of Appeals for the First Circuit explained in *Thibeault:*

> Recognizing the importance of expert testimony to modern trial practice, the Civil Rules provide for extensive pretrial disclosure of expert testimony. This disclosure is consonant with the federal courts' desire to make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent. In the arena of expert discovery—a setting which often involves complex factual inquiries—Rule 26 increases the quality of trials by better preparing attorneys for cross examination, minimizing surprise, and supplying a helpful focus for the court's supervision of the judicial process. In short, Rule 26 pro-

motes fairness both in the discovery process and at trial. For Rule 26 to play its proper part in this salutary scheme, discovery must not be allowed to degenerate into a game of cat and mouse.

960 F.2d at 244 (citations and internal quotation marks omitted).

In this case, the discovery deadline was set at September 7, 1996. Plaintiffs first served discovery requests on Ford in April 1994. After an extended period of disagreement during which Ford declined to respond, plaintiffs, pursuant to Ford's suggestion, filed amended discovery requests on March 26, 1996. Ford returned initial responses on May 8, 1996 and delivered the requested documents on June 12 and 24, 1996 with the declaration that "this completes our document production."

Months later, Ford produced "supplemental" responses to these requests: more than 10,000 documents and 20 videotapes in two banker's boxes on September 12, 1996, and two more banker's boxes of documents and videotapes on September 27, 1996. The supplemental productions consisted of tests conducted by Ford's expert, Dr. Prasad, relating to the substance of his testimony that the seat performed safely and according to design in the accident.

The record establishes that plaintiffs did not even know that the supplemental documents existed until August 14, 1996, when Ford announced their intended delivery on "August 16, 1996, or early in the week of August 19, 1996." After giving such notice, Ford waited until August 28, 1996 to advise plaintiffs that it would produce the documents only under a protective order. Ford apparently had concerns regarding the availability of the material to other plaintiffs' counsel. Ford, however, had already produced the same or similar documents to other plaintiffs' counsel in another case involving similar claims [13] and, presumably, should

set for trial as of January 1, 1997 and to cases assigned a trial date of June 2, 1997 or thereafter." The amendment thus does not control here.

**13.** *See Traxler v. Ford Motor Co.,* 227 Mich.App. 276, 576 N.W.2d 398 (1998). At the hearing on the motion in limine, Ford's counsel stated that

the documents "were produced for the first time in early August" in the *Traxler* case. The dissenting opinion in *Traxler* identifies the delivery date in that case as August 12, 1996. *Id.* at 410.

*Traxler* similarly involved a defective seat design claim against Ford and the production of a prodigious amount of documents at a late stage

have known of the sensitive nature of the documents when it informed plaintiffs of their existence in the first instance.[14]

On September 4, 1996, plaintiffs proposed that Ford produce the documents for review by plaintiffs' expert, Cantor, and counsel only, pending finalization of the protective order. Ford did not initially agree with this suggestion.[15] Ford apparently later agreed to deliver the documents on September 9, 1996. The first set of documents, however, did not reach plaintiffs until September 12, 1996, during the deposition of Cantor.

At the hearing on their motion to exclude the evidence, plaintiffs' counsel represented that Cantor had "made some efforts" at digesting the contents of the September 12 production, but that "it was difficult for him to even interpret these." Although counsel attempted to question Dr. Prasad on the documents in a day-long deposition on September 23, with the assistance of an index provided by Ford, counsel discounted the deposition's value, asserting that he did not have an opportunity to review the material. Counsel was relegated to asking Dr. Prasad questions about the production on Cantor's behalf so that Cantor could interpret them. As for the September 27 production, counsel stated at the hearing that neither he nor Cantor had reviewed it at all.

Ford asserts, as it did before the trial court, that "[t]hese materials comprised an on-going research project at Ford which was not completed and released until August of 1996." According to Dr. Prasad's deposition testimony, however, the project was not recent, the test was "no secret" to Ford management, the data and results were on the company computer, and "anyone c[ould] access the data." Dr. Prasad had informed Ford's counsel of the availability of some of the material as early as January and May 1996. Moreover, the record reveals that the September 12 production included documents dating as far back as April 1993 and continuing through November 1994, September 1995, October 1995, January 1996, May 1996, and June 1996. Although Ford may have needed time to process or prepare the more recent documents for production, one may reasonably expect documents available for several years to have been produced earlier than the eve of trial. Even with respect to the later tests, we believe that Ford should have been less dilatory in delivering the documents to the plaintiffs.

■ Furthermore, while the parties informally agreed to extend the discovery deadline in order to allow further expert depositions, we do not regard this arrangement as a waiver by plaintiffs of their right to receive documents of such volume and complexity in a sufficiently timely manner to allow an effective response. We recognize, of course, the normal tendency for preparations to intensify as trial approaches and, thus, suggest no general bar to material produced seasonably and in good faith. *See Fusco v. General Motors Corp.*, 11 F.3d 259, 266 (1st Cir.1993). In this case, however, we believe that, if Ford intended to rely on this evidence at trial, it should have made more diligent efforts at its timely production. *Cf. Glover v. Grace Pac. Corp.*, 86 Hawai'i 154, 164, 948 P.2d 575, 585 (App.1997) (holding that the trial court properly excluded an

of discovery. The trial court in that case entered an order of default against Ford, finding that "Ford had concealed very significant documents and information, and worse, had blatantly lied about those documents and about the information in them[.]" *Id.* at 400 (majority opinion). The court of appeals, however, remanded for a hearing on issues of prejudice caused by the Ford's conduct and its culpability for that conduct. *Id.* at 404.

The facts in *Traxler* are suggestive, but ultimately inconclusive, regarding the present case. *Traxler* does indicate, however, that Ford had already produced documents to other plaintiffs while it insisted on a protective order from the plaintiffs in this case. Furthermore, it does not

appear from the facts of the opinion that Ford required a protective order from the *Traxler* plaintiffs.

14. In the final stipulated protective order, filed October 4, 1996, Ford ultimately agreed to allow plaintiffs to share the documents with plaintiffs in other cases.

15. During the hearing on the motion in limine, Ford's counsel asserted that Ford had offered to make the documents available for review by plaintiffs' counsel and Cantor only, pending a ruling on the protective order. The record, however, does not support this claim.

expert who failed to arrive at his final opinion before the discovery cutoff date).

The trial court, nevertheless, distinguished the September 12 and 27 productions on the basis that plaintiffs had been able to review the September 12 documents and depose Dr. Prasad about them. Given the months, even years, that Ford took to produce the material, however, we are much less convinced of the salutary effect of the additional two weeks plaintiffs had to review the September 12 production. In the final analysis, we discern no difference between the two productions in terms of tardiness, volume, and unfair surprise. We thus hold that the trial court abused its discretion by failing to exclude both supplemental productions from evidence.

▇ Additionally, we cannot say that this error was harmless. *See* HRS § 641–2 (1993); HRCP Rule 61 (1980).[16] *See also Lee,* 77 Hawai'i at 455, 887 P.2d at 665 (observing that discovery violations warrant a new trial where the movant demonstrates "that she was prejudiced and that failure to grant a new trial is inconsistent with substantial justice"). At trial, Dr. Prasad, Ford's key expert witness regarding its defense that the seat back was safe, testified in considerable detail and length, based in part on tests included in the September 12 production. Ford also presented the test material to the jury.[17] In impairing plaintiffs' ability to respond, therefore, Ford's late production prejudiced plaintiffs' rights both to timely discovery and to a fair trial.

Ford asserts that, by the time of his September 27 deposition, Cantor had analyzed, charted, and formed opinions on the September 12 material. Ford fails to mention, however, that the motions court's sanction order limited Cantor's testimony to opinions rendered before September 7, 1996.[18] Thus, at trial, Ford objected to Cantor's testimony regarding tests included in the September 12 production, and the trial court sustained the objection. Even assuming that plaintiffs had sufficient time to prepare, therefore, any such preparation could assist them little at trial. Standing alone, the admission of the September 12 material may not have prejudiced plaintiffs to such a degree as to constitute reversible error. Combined with the exclusion of any testimony by Cantor in response, however, it resulted in an unfair inconsistency that denied plaintiffs of any opportunity to mitigate the prejudice caused by Ford's untimeliness. Under these circumstances, the dilatory production of documents by Ford warrants a new trial. *Cf. Mawby v. United States,* 999 F.2d 1252, 1254 (8th Cir. 1993) (holding that "fundamental fairness" demands at least an opportunity to present rebuttal to surprise evidence); *Piester v. International Bus. Machs., Corp.,* 929 F.Supp. 595, 599–600 (D.R.I.1996) (ordering a new trial because of inconsistent rulings under the discovery rules).

▇ In certain situations, a new trial may obviate the harm caused by a late production by allowing more time for preparation. *See, e.g., Freeman v. Minnesota Mining & Mfg. Co.,* 675 F.Supp. 877, 889 n. 5 (D.Del.1987) (holding that, because the supplementation issue arose in a summary judgment motion, and the time before trial would allow the opposition to respond, "the equities would point to the reopening of discovery as the appropriate sanction"). Indeed, in imposing a sanction for failure to supplement in the first instance, a court may exclude the witness or evidence, or may simply grant a

---

16. HRS § 641–2 provides in relevant part: "No judgment, order or decree shall be reversed, amended or modified for any error or defect unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant." HRCP Rule 61 states in relevant part: "[N]o error or defect in any ruling or order ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice."

17. The transcript reveals that, while Dr. Prasad testified, Ford played a substantial amount of videotaped footage to the jury, some of which apparently came from the September 12 production. The transcript also indicates that the September 12 material was submitted to the jury under seal. Ford does not dispute the importance of the September 12 material.

18. Although the motions court imposed this sanction in the hearing on Ford's motion to dismiss, the record plainly indicates that the court based the sanction on the formal discovery deadline.

continuance. Courts determine the appropriate sanctions based not only on "surprise and prejudice, including the opponent's ability to palliate the ill effects stemming from the late disclosure," *see, e.g., Thibeault,* 960 F.2d at 246 (citations omitted), but also on the importance of the testimony or evidence, the explanation, if any, for the untimeliness, and the possibility of granting a continuance, *see, e.g., Bradley v. United States,* 866 F.2d 120, 126–127 (5th Cir.1989).

Although the exclusion of testimony or evidence may be a somewhat harsh sanction,

> a continuance is often ineffectual as a sanction and unfair to both the court and the opposing party.... If continuances were granted as a matter of course for violations of Rule 26(e), the rule could always be disregarded with impunity. Courts could not set their calendars and conscientious litigants could not count on the stability of trial dates previously established.

*Thibeault,* 960 F.2d at 246 (citations omitted). *See also Freund v. Fleetwood Enters.,* 956 F.2d 354 (1st Cir.1992) ("A continuance on the eve of trial would have offered defendants only a Hobson's choice of inadequate preparation or costly delay[.]").

In this case, the letter and spirit of HRCP Rule 26(e) demand the exclusion of the documents produced after September 7, 1996.[19] Ford has failed to provide an adequate explanation for the delay. Moreover, Ford may still use the timely produced documents on retrial. Finally, insofar as the propriety of limiting Cantor's testimony to conclusions reached before the discovery deadline is undisputed, we think it only fair to enforce the same deadline against Ford's supplemental production.

We are mindful, however, of the possibility that, rather than the reciprocal remedy of exclusion provided above, the parties may prefer to have access to all of the evidence produced after the discovery deadline. Insofar as the parties informally agreed to extend the deadline, and the circuit court effectively ratified this agreement by scheduling deposi-

tions after September 7, 1996, we do not wish to foreclose this alternative. Thus, on remand, we do not preclude the parties from stipulating to admit Cantor's testimony and Ford's supplemental documents in full, subject to the rules of evidence.

In sum, we affirm the ICA's holding that the circuit court erred in denying plaintiffs' motion to exclude Ford's supplemental production. We further hold that Ford's noncompliance with the discovery rules provide an independent and sufficient grounds for a new trial. On retrial, Ford may only present evidence produced up to and including September 7, 1996, the discovery cut-off date. The parties, however, may stipulate to allow both Cantor's testimony and Ford's supplemental productions, if otherwise admissible.

### C. *Directed Verdict: Substantial Change*

■ Finally, Ford contends that the ICA erred in affirming the trial court's denial of Ford's motion for a directed verdict. Ford maintains that the plaintiff in a products liability suit must demonstrate, as part of his or her prima facie case, the absence of any substantial change once the product leaves the seller's hands. In this case, it is agreed that plaintiffs did not submit any evidence on the issue of substantial change; this final point on appeal, therefore, turns on the legal question of the burden of proof. We review questions of law *de novo. See Housing Fin. & Dev. Corp. v. Ferguson,* 91 Hawai'i 81, 86, 979 P.2d 1107, 1112 (1999).

In *Stewart v. Budget Rent–A–Car Corp.,* 52 Haw. 71, 470 P.2d 240 (1970), this court first articulated the rule of strict products liability, to the effect that

> one who sells or leases a defective product which is dangerous to the user or consumer or to his property is subject to liability for physical harm caused by the defective product to the ultimate user or consumer, or to his property, if (a) the seller or lessor is engaged in the business of selling or leasing such product, and (b) the product *is expected to and does reach the user or*

---

**19.** While a continuance is inadequate in this case, it may not be so in others. Litigants objecting to late productions should request continuances in the alternative to exclusion, rather than relying on the potentially unfounded hope of a new trial based on a denial of a single request for exclusion. *See Szeliga v. General Motors Corp.,* 728 F.2d 566, 568 (1st Cir.1984).

*consumer without substantial change in its condition after it is sold or leased.* Id. at 75, 470 P.2d at 243 (emphasis added). The *Stewart* court explained that it "essentially" adopted the rule in Restatement (Second) of Torts (hereinafter Restatement (Second)) § 402A (1977).[20] *Stewart,* 52 Haw. at 75, 470 P.2d at 243.[21]

We initially note that, notwithstanding its obvious significance in the rule pronounced in *Stewart,* the issue of substantial change does not apply in every case. With respect to newer products, for example, the issue hardly arises. *See, e.g., id.,* 52 Haw. at 78–79, 470 P.2d at 244–45 (holding that, given the relatively unused condition of the car, there was sufficient evidence to withstand a directed verdict in favor of the manufacturer and distributor). Moreover, the issue has limited significance in cases alleging design, as opposed to manufacturing, defects "since obviously the design of the product does not change from the date of its original manufacture, absent some modification in design." *Rix v. General Motors Corp.,* 222 Mont. 318, 723 P.2d 195, 199 (1986) (citation omitted). *See also Bradford v. Bendix–Westinghouse Auto. Air Brake Co.,* 33 Colo.App. 99, 517 P.2d 406, 413 (1973) (holding that acts of improper maintenance were insufficient to defeat plaintiffs' defective design claim). As explained in L. Frumer & M. Freeman, 1

*Products Liability* § 8.04[7][b], at 8–228–27 (rev. ed.1999):

> As a practical matter, ... in most strict liability lawsuits, in most jurisdictions, whether or not there was a substantial change in the condition in the product is a non-issue. The product under consideration may be brand new, its very nature will obviate the possibility of a substantial change or any change at all, or an inspection will disclose no obvious alteration or modification of its condition from the one that existed at the time of manufacture, sale, or delivery. Therefore, while the plaintiff may not necessarily come forward affirmatively with proof that the condition is unchanged, the defendant cannot, in good faith, assert that there is anything amiss.

(Footnote omitted.)

Given the ad hoc applicability of "substantial change," it is not surprising that different views have emerged as to the proper distribution of the burden of proof on the issue.[22] Some courts require the plaintiff to affirmatively prove the absence of any substantial change. *See Waggoner v. Mercedes Benz of N. Am., Inc.,* 879 S.W.2d 692, 695–96 (Mo.Ct. App.1994) (holding that plaintiffs' failure to prove that the subject air valve had not been altered in some way invalidated their design defect claim); *Jasinski v. Ford Motor Co.,*

---

**20.** In its entirety, section 402A reads:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to the property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) *it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.*
> (2) The rule stated in Subsection (1) applies although
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(Emphasis added.)

**21.** This court has held that the *Stewart* and Restatement rules differ in at least one respect;

unlike the Restatement formulation, *see supra* note 20, the *Stewart* rule does not require the product to be "unreasonably" dangerous. *See Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 367, 944 P.2d 1279, 1310 (1997); *Brown v. Clark Equipment Co.,* 62 Haw. 530, 541–43, 618 P.2d 267, 274–75 (1980).

**22.** In support of its argument that the plaintiff must prove the absence of substantial change, Ford cites Restatement (Second) § 402A cmt. g, which states: "The burden of proof that the product was *in a defective condition at the time that it left the hands of the particular seller* is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained." (Emphasis added.) This does not speak to the burden of proof with respect to any substantial change *after* the allegedly defective product leaves the seller's hands. The Restatement (Second) provides little guidance on what constitutes "substantial change," *see id.* § 402 cmt. p, much less the burden of proof on the question.

824 S.W.2d 454, 456 (Mo.Ct.App.1992) (affirming summary judgment because plaintiff failed to demonstrate that the allegedly defective transmission had not been somehow replaced or substantially changed over the life of the automobile); *Humphreys v. General Motors Corp.*, 839 F.Supp. 822, 827–28 & n. 6 (N.D.Fla.1993), *aff'd*, 47 F.3d 430 (11th Cir.1995) (holding that plaintiff must, on his or her own initiative, prove that the product reached him or her without substantial change).[23] Other courts have held that the defendant has either the sole burden of raising and proving substantial change as an affirmative defense, *see Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20 (Tex.1987), or the burden of proving the issue in certain cases or in limited respects, *see Andrews v. Harley Davidson, Inc.* 106 Nev. 533, 796 P.2d 1092, 1096–97 & n. 3 (1990) (holding that defendant has the burden of proving that a product has been altered, unless the product has been lost, whereupon plaintiff must bear the burden of *persuasion* if the *defense* of substantial change is raised); *Navarro v. George Koch & Sons, Inc.*, 211 N.J.Super. 558, 512 A.2d 507, 515 (Ct.App. Div.), *cert. denied*, 107 N.J. 48, 526 A.2d 138 (1986) (requiring plaintiff to prove that the subsequent substantial alteration was foreseeable, but requiring defendant to establish the alteration as an intervening superseding cause or sole proximate cause of the accident).

A majority of courts, however, follow the approach best described by the federal district court in *Southwire v. Beloit E. Corp.*, 370 F.Supp. 842 (E.D.Pa.1974):

To be sure, there are reasons for requiring the defendant to carry the burden of coming forward and alleging a substantial change. In many cases, the alleged substantial change is perceived only by the defendant who should, therefore, have to allege it and maintain the burden of going forward with the evidence on the point. The plaintiff is accordingly put on notice to try to prove no substantial changes were made. And as a general rule, rather than requiring a plaintiff to negate an infinite number of possible changes, it seems more reasonable and in keeping with our adversary process to expect the defendant to allege the substantial changes he expects a plaintiff to try to disprove. But once the defendant has come forward, we believe that the burden of proof (or again, more precisely, the risk of non-persuasion) must remain with the plaintiff; if the scales remain in equilibrium on the point, plaintiff is the loser.

*Id.* at 857. *See also Potter v. Chicago Pneumatic Tool Co.*, 241 Conn. 199, 694 A.2d 1319, 1341 (1997) (holding that plaintiff need not "rebut every possible alteration or modification, but only those that the defendant has produced"); *Berry v. Gibson*, 141 Ill.App.3d 876, 96 Ill.Dec. 219, 491 N.E.2d 33, 36 (1986) (stating that "there is no duty upon plaintiffs in making a *prima facie* product liability case to eliminate all possible causes of the incident other than the one they alleged" (citation omitted)); *Kuhnke v. Textron, Inc.*, 140 Ariz. 587, 684 P.2d 159, 162 (1984) (ruling that "once a defendant comes forward with some evidence of substantial change, the burden is

---

**23.** Ford asserts that the "vast majority of jurisdictions" place the burden of negating substantial change exclusively on the plaintiff. In most of the cases Ford cites, however, it was undisputed that some change had occurred in the product. *See, e.g., Glassey v. Continental Ins. Co.*, 176 Wis.2d 587, 500 N.W.2d 295, 300–301 (1993) (holding that the replacement of the cap of the subject spray tank constituted a substantial change); *Rients v. International Harvester Co.*, 346 N.W.2d 359, 362 (Minn.Ct.App.1984) (observing, in light of the "numerous modifications and repairs" made on the tractor's allegedly de-

fective axle, that "it would be sheer speculation for a jury to find that the design defect caused the accident"); *Cornette v. Searjeant Metal Prods., Inc.*, 147 Ind.App. 46, 258 N.E.2d 652, 657 (1970) (ruling that the plaintiff failed to establish the complained lack of an air filter as a "defective condition attributable to the manufacturer," where she adduced no evidence that the filter was not on the machine when it was delivered or sold). Apart from the two jurisdictions cited in the text above, we are aware of no others that compel plaintiff to negative substantial change from the outset.

on the plaintiff to show no substantial change" (citing *Southwire* )); *Hiller v. Kawasaki Motors Corp. U.S.A.*, 671 P.2d 369, 372 (Alaska 1983) (holding that the plaintiff must first establish that the product left the seller's hands in a defective condition, after which the seller "may introduce evidence that its product was substantially altered after leaving its possession, which evidence may rebut or overcome the plaintiff's showing that his injuries were a result of the product's defect"); *cf. Dutsch v. Sea Ray Boats, Inc.*, 845 P.2d 187 (Okla.1992) (recognizing that substantial change is a "defense" to a products liability claim); *Fenley v. Rouselle Corp.*, 531 So.2d 304 (Ala.1988) (same).

 Hawai'i appellate courts have yet to determine which party must bear the burden of proof on the issue of substantial change. *See, e.g., Stewart,* 52 Haw. at 78–79, 470 P.2d at 245 (merely deciding that "there was sufficient evidence" to go to the jury on whether the product was defective when it left the hands of the manufacturer and distributor). Presented with the question here, we adopt *Southwire*'s "burden-shifting" rule. To the extent that the issue of substantial change bears directly on the question of liability, the plaintiff should shoulder the ultimate burden of proof, or "risk of nonpersuasion." *See Stewart,* 52 Haw. at 75, 470 P.2d at 243 (insisting on "proof that the product was in some way defective and that the damages were caused by the defect" (emphasis added)). At the same time, we refuse to saddle the plaintiff in strict products liability cases with the burden of proving a negative from the outset. *Andrews,* 796 P.2d at 1096–97 ("[I]t is unfair to force the plaintiff consumer to prove a negative, *i.e.,* that the product was not altered."). Rather, we believe that the "burden-shifting" approach advanced in *Southwire* strikes the appropriate balance by maintaining plaintiff's burden of persuasion, but eliminating the possibility that defendant may prevail on the bare allegation that some unidentifiable change occurred in the product. *Cf. Hurd v. American Hoist & Derrick Co.,* 734 F.2d 495, 501 (10th Cir.1984) (ruling that the mere "conclusory statement" that

substantial change had occurred was insufficient to create a jury question). This balance, we note, comports with the underlying philosophy of strict products liability, leaving the ultimate burden of proof with the party in control of the product when the substantial change allegedly would have occurred, *see Stewart,* 52 Haw. at 75, 470 P.2d at 243 (recognizing the significance of "control" in strict products liability), but still advancing the public interest in "the maximum possible protection that the law can muster against dangerous defects in products," *id.* at 75, 470 P.2d at 243.

 In the instant case, plaintiffs did not present any evidence regarding substantial change. Neither, however, did Ford. Ford based its defense on the theories that 1) Stender was seated in an unusual position; and, in any event, 2) the seat design was not dangerous. Ford never alleged or adduced evidence of any specific alterations to the Tempo relevant to plaintiff's design defect claim. Without further specification by Ford, the issue of substantial change cannot operate to defeat plaintiffs' claim.

Ford asserts that, even if this court adopts the *Southwire* rule, it should recognize an exception here, because the loss of the Tempo denied Ford the opportunity to find any changes. Ford, however, was able to conduct some discovery on the condition of the Tempo and the seat, which apparently did not suggest any substantial changes. More importantly, in urging this court to apply the approach of the Missouri courts in *Waggoner* and *Jasinski* in this case, Ford essentially seeks the dismissal of plaintiffs' claim for relief. The circuit court, however, consistently declined to impose such a sanction. Notwithstanding previous uncertainty regarding the burden of proof, *Stewart* expressly identified substantial change as a relevant factor in a products liability case. We may thus presume that the circuit court considered the issue in fashioning its spoliation remedy, which does not appear unreasonably unfair to Ford.

Accordingly, we affirm the ICA's decision that the trial court did not err in denying defendant's motion for directed verdict. Plaintiffs need only address those changes,

relevant to their design defect claim, that Ford raises by fulfilling its initial burden of production.

## III. CONCLUSION

For the reasons stated above, we reverse that part of the ICA's order holding that the circuit court erred in giving the instant adverse inference instruction, affirm that part holding that the court erred by partially denying plaintiff's motion to exclude Ford's supplemental productions, and remand for a new trial consistent with this opinion. In all other respects, we affirm the ICA's order.